**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **JOHN KELK,** *individually and on behalf of all others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> **BAUSCH HEALTH COMPANIES INC.,** *et al.*, <br><br> Defendants. | Civil Action No. 23-3996 (ZNQ) (RLS) <br><br> **OPINION** |

**QURAISHI, District Judge**

 **THIS MATTER** comes before the Court upon (1) a Motion to Dismiss (the "Motion to Dismiss," ECF No. 42) filed by Defendants Bausch Health Companies Inc. ("Bausch Health" or "the Company"), Joseph Papa, Paul Herendeen, and Thomas Appio (collectively, "Defendants"), and (2) a Motion for Leave to File a Sur-Reply (the "Sur-Reply Motion," ECF No. 52) filed by Lead Plaintiffs R. Cassian Anderson and Donna S. Preves (collectively, "Plaintiffs").[1] Defendants filed a Brief in Support of the Motion to Dismiss. ("Moving Br.," ECF No. 42-1.) Plaintiffs filed a Brief in Opposition to Defendants' Motion to Dismiss ("Opp'n Br.," ECF No. 43), to which Defendants replied ("Reply Br.," ECF No. 44). Plaintiffs also submitted a Brief in Support of their

---

[1] The initial class-action Complaint was filed by John Kelk. On consent of the parties, Plaintiffs Anderson and Preves were appointed Lead Plaintiffs. (ECF No. 20.) The Amended Complaint identifies them as Lead Plaintiffs. (ECF No. 24.) The Amended Complaint does not identify John Kelk among the named plaintiffs yet the case caption has not been updated. Plaintiffs are encouraged to remedy this in any further amended pleading.

Sur-Reply Motion ("Sur-Reply Br.," ECF No. 52-1), which Defendants opposed ("Opp'n to Sur-Reply," ECF No. 53).

The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1.[2] For the reasons set forth below, the Court will **GRANT** Defendants' Motion to Dismiss (ECF No. 42), and **DENY** Plaintiffs' Sur-Reply Motion (ECF No. 52.)

## I.    <u>BACKGROUND AND PROCEDURAL HISTORY</u>[3]

### A.    **Procedural History**

Plaintiffs filed an initial complaint on July 26, 2023.  (Compl., ECF No. 1.)  Thereafter, on January 19, 2024, Plaintiffs filed a ninety-five-page amended class-action[4] complaint alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Securities Exchange Act" or "the Act") (Counts One and Two, respectively).[5]  (Am. Compl., ECF No. 17.) Defendants filed the instant Motion to Dismiss on July 9, 2024.  (ECF No. 42.)  Plaintiffs then sought leave to file a sur-reply after the Motion to Dismiss was fully briefed.  (ECF No. 52.)

### B.    **Factual Background**

As alleged in the Amended Complaint, Defendant Bausch Health is a global healthcare conglomerate that develops, manufactures, and markets a broad range of pharmaceuticals and medical devices in the areas of eye-health, gastroenterology, and dermatology.  (Am. Compl. ¶¶ 17, 28.)  Bausch Health's common stock is traded on the New York Stock Exchange.  (*Id.*) Also named as defendants are Joseph Papa ("Chairman Papa"), Bausch Health's former Chairman

---

[2] All references to Rules hereinafter refer to the Federal Rules of Civil Procedure unless otherwise noted.

[3] For the purpose of considering this Motion, the Court accepts all factual allegations in the Complaint as true.  *See Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

[4] The proposed class includes all persons who purchased or otherwise acquired the common stock of Bausch Health between May 7, 2020 and June 8, 2023 (the "Class Period").  (Am. Compl. ¶ 1.)

[5] Count One alleges a violation of both Section 10(b) and corresponding Rule 10b-5 of the Securities Exchange Act.

and Chief Executive Officer, (*id.* ¶ 18), Paul Herendeen ("CFO Herendeen"), Bausch Health's former Chief Financial Officer and Executive Vice President, (*id.* ¶ 19), and Thomas Appio ("CEO Appio"), Bausch Health's current Chief Executive Officer, (*id.* ¶ 20), (collectively, "the individual Defendants"). Prior to Bausch Health becoming a corporate entity in 2018, Bausch Health was Valeant Pharmaceuticals International, Inc. ("Valeant"). (*Id.* ¶ 2.) Valeant changed its name to Bausch Health as a result of securities violations. (*Id.*) After the name change, Plaintiffs allege that Defendants maintained a façade that downplayed the Company's financial struggles, including that the Company owed billions of dollars in liability from Valeant shareholders, and that the Company's most valuable drug—Xifaxan—was "seriously threatened."[6] (*Id.* ¶¶ 4, 6)

The Class Period begins on May 7, 2020 "when Defendants misleadingly told investors that they 'preserved market exclusivity' over Xifaxan 'until 2028'—while making no mention of the ongoing and credible challenge to its patents by Norwich Pharmaceutical Inc. [("Norwich")], one of its competitors." (*Id.* ¶ 7.) Defendants also purportedly downplayed the threat of litigation from its Valeant past. (*Id.*) As a result of these problems, the Company's stock price declined, "injuring investors" who purchased Bausch Health shares. (*Id.* ¶ 8.)

As background of Bausch Health's finances and subsidiaries, prior to May 5, 2021, Bausch Health's portfolio of products included (1) Bausch + Lomb/International ("B+L"); (2) Salix, a large specialty pharmaceutical company committed to treating gastrointestinal disorders; (3) Ortho Dermatologics; and (4) Diversified Products. (*Id.* ¶ 29.) Bausch Health's 2022 Form 10-K revealed that its revenues for 2022, 2021 and 2020 were "$8,124 million, $8,434 million and $8,027 million, respectively." (*Id.* ¶ 31.) As of December 31, 2019, Bausch Health had $33.8 billion of assets with long-term debt totaling $24.6 billion. (*Id.* ¶ 32.) Bausch Health also had an

---

[6] Xifaxan is a tradename for rifaximin, a drug that treats irritable bowel syndrome, hepatic encephalopathy, and traveler's diarrhea. (Am. Compl. ¶ 109.)

earnings before interest, taxes, depreciation, and amortization (EBITDA) score of 7.5, indicating that it was at serious risk of default according to various financial agencies. (*Id.* ¶ 35.)

However, contrary to those liabilities and risks of default, Chairman Papa stated on May 12, 2020 that Bausch Health has "paid down over $8 billion of debt since . . . 2016. [The Company] recognizes though, that [it] still ha[s] significant amount of debt, and [is] continuing to look to pay down the debt. . . . So, for example, [the Company] divested about $3.8 billion of assets, the proceeds that [it] received to pay down debt as one example." (*Id.* ¶ 38.) According to the Amended Complaint, Bausch Health conducted no major divestitures in 2018, 2019, or 2020 other than what the Amended Complaint calls the "B+L spinoff" in August 2020.[7] (*Id.* ¶ 41.)

1.     Defendants' Attempts to Reduce Debts—the Spinoff

The B+L spinoff is integral to this litigation. In August 2020, to reduce its debts, Bausch Health officially announced the B+L spinoff, which would last "roughly a year and a half" and would create two separate companies: an eye health company based on Bausch + Lomb, and a diversified pharmaceutical company. (*Id.* ¶¶ 43, 44.) When asked why the spinoff was announced now given that the "idea . . . had been floated in the past," Chairman Papa explained that there were legal issues the Company needed to get past and that those legal issues were now "behind" the Company. (*Id.* ¶ 45.) At this time, as a result of the spinoff and positivity surrounding the business, the Company's stock price surged approximately 30 percent. (*Id.* ¶ 48.) Different analysts from financial institutions like Piper Sandler, Barclays, Cowen, Truist, and Guggenheim were optimistic about the spinoff, but noted that its success would depend on the "durability of the

---

[7] According to the Amended Complaint, "the term 'B+L spinoff' refers to all the steps of the separation, including: (1) reorganization of Bausch Health subsidiaries to move the vision health business to B+L; (2) an [initial public offering] of approximately 10% of B+L stock, which took place in May 2022; and (3) a distribution by dividend of the remaining B+L stock to Bausch Health shareholders, which has yet to take place. In other sources, the term spinoff refers specifically to step three, the stock dividend." (Am. Compl. ¶ 43 n.3.)

prescription drug business," including the drug Xifaxan, and the long term strength of the eye care business.  (*Id.* ¶¶ 47, 50.)  However as alleged, "Defendants concealed from the market the fact that neither of these conditions would hold true."  (*Id.* ¶ 51.)

On September 16, 2020, CFO Herendeen noted the Company's plan for success, explaining that "one way [to] proceed" would be to sell approximately 20 percent of B+L in an initial public offering ("IPO").  (*Id.* ¶ 52.)  In February and March 2021, a hedge fund that owned a small portion of Bausch Health, and J.P. Morgan, wrote to Bausch Health management criticizing Defendants' plans to reduce its debt.  (*Id.* ¶¶ 55, 56.)  On May 4, 2021, while the spinoff was still in progress, Bausch Health announced that it had completed internal accounting rearrangements so that it could move forward with the spinoff and reduce its debts.  (*Id.* ¶ 59.)  Simultaneously, Defendants allegedly stated that Bausch Health would be almost three times as leveraged as B+L, as a result of the spinoff.  (*Id.* ¶ 60.)  On this news, Bausch Health stock dropped approximately 11 percent in a single day, closing at $27.94, down from $31.42.  (*Id.* ¶ 63.)

On August 3, 2021, Defendants announced plans for an IPO of Solta, Bausch Health's medical aesthetics subsidiary.  (*Id.* ¶ 68.)  This IPO was to take effect before the B+L IPO, "paving the way for the B+L spinoff by helping pay down Bausch Health debt with the money raised from the IPO."  (*Id.*)  However, this IPO was later suspended in light of challenging market conditions. (*Id.* ¶ 83.)

On January 13, 2022, Defendants filed an S-1 for the B+L IPO.[8]  (*Id.* ¶ 69).  On January 18, 2022, Defendants announced a credit agreement where some of its debts would be refinanced. (*Id.* ¶ 70.)  On April 28, 2022, Bausch Health announced a price target of $21.00 to $24.00 per share for the B+L IPO, "which was significantly lower than Defendants had led the market to

---

[8] The Court takes judicial notice of the fact that a Form S-1 is used to register securities under the Securities Act of 1933.

expect." (*Id.* ¶ 71.)  One reason for the lower-than-expected price per share was because of Norwich's intellectual property challenge to Xifaxan. (*Id.* ¶ 72.)  On this news, Bausch Health's stock closed at $19.01, down from $20.56. (*Id.* ¶ 73.)

One month later, Bausch Health announced a final price of $18.00 per share for the B+L IPO, which indicated they raised only $630 million in the B+L IPO thus far, which was less than expected. (*Id.* ¶ 75.)  In response to reports by analysts on new price targets, Bausch Health stock dropped again, closing at $12.90 on May 9, 2022. (*Id.* ¶ 82.)

### 2.   Xifaxan Litigation

In addition to the alleged misrepresentations regarding Defendants' debts, the Amended Complaint alleges that there were misrepresentations as to the strength of Defendants' Xifaxan patents, which directly impacted the stock price of the B+L IPO, and ultimately Bausch Health's shareholder value.  Notably, the success of Xifaxan was crucial to Bausch Health's success.  In fact, many analysts stated that the Company was dependent on the success of Xifaxan. (*Id.* ¶ 64.) The analysts and Plaintiffs assumed that the Xifaxan patents were safe until 2028 because Defendants did not disclose the seriousness of any challenges to Xifaxan in the market. (*Id.* ¶ 65.)

As previously explained, one subsidiary of Bausch Health is Salix, a large specialty pharmaceutical company committed to treating gastrointestinal disorders. (*Id.* ¶ 105.) During the Class Period, Xifaxan was Salix's largest product. (*Id.* ¶ 107.)  Additionally, Salix holds a number of patents for Xifaxan. (*Id.* ¶ 108.)  In February 2020, Defendants were advised that Norwich, a subsidiary of Alvogen PB Research and Development LLC, a privately owned company that markets pharmaceutical products, submitted a drug application to the Food and Drug Administration ("FDA") for approval of a generic version of Xifaxan. (*Id.* ¶ 111.)  Norwich simultaneously sent a letter to Salix stating that its patents covering Xifaxan were invalid. (*Id.*)  In response, Bausch Health, through Salix, filed a Complaint against Norwich in the United States

District Court for the District of Delaware alleging patent infringement.  (*Id.* ¶ 112.)  That litigation is ongoing.  (*Id.* ¶ 113.)

Relevant to the instant Motion to Dismiss, Plaintiffs allege that Defendants "were aware of Norwich's position by no later than February 2020, [but] investors were essentially left in the dark."  (*Id.* ¶ 118.)  Plaintiffs cite in the Amended Complaint to various misleading representations made by Defendants that their patents for Xifaxan were safe.  (*See, e.g.*, *id.* ¶ 118.)  Market perception was impacted by these mispresentations and stock prices decreased.  (*Id.* ¶ 119.)

In March 2022, a four-day bench trial took place to address the patent dispute before a district judge in the District of Delaware.  (*Id.* ¶ 120.)  As a result of this trial, Bausch Health stock dropped, closing at $12.90 on May 9, 2022.  (*Id.* ¶ 121.)  In July 2022, Bausch Health lost patent exclusivity for Xifaxan, resulting in the B+L spinoff unlikely to move forward.  (*Id.* ¶ 83.)[9]  At this time, as a result of losing some of the patents, Bausch Health's stock "plummeted by 47%," closing at $4.62.  (*Id.* ¶ 124.)  However, after the court's decision, the District of Delaware refused to allow Norwich to enter the market prior to the expiration of Salix's patents, thereby representing a partial win for Bausch Health.  (*Id.* ¶ 125.)

Given the Xifaxan litigation and Defendants' attempts to reduce the Company's debt, Plaintiffs allege that Defendants knew or should have known that the B+L spinoff was unlikely to proceed.  (*Id.* ¶ 88.)  The liability exposure to Defendants, according to Plaintiffs, was "concealed from investors."  (*Id.* ¶ 91.)  Moreover, according to Plaintiffs, Defendants "downplayed their exposure . . . assuring investors there were only 'some' or 'a couple' of opt-outs and that the Valeant saga was essentially 'in the rearview.'"  (*Id.*)  To make matters worse, in March 2022,

---

[9] Paragraph 84 succinctly explains the correlation between Xifaxan and the B+L spinoff: "Bausch Health gave its most valuable assets to B+L but gave it relatively minor liabilities, the result being that the spinoff would leave Bausch Health with very high debt ratios (made even worse by the disappointing IPO).  This, in turn, left no room for error: any reduction to Bausch Health's EBITDA would push its debt ratios to dangerously high levels."  (Am. Compl. ¶ 84.)

several institutional investors filed a fraudulent conveyance action against Bausch Health in New Jersey state court. (*Id.* ¶ 93.) The basis of that suit was that the transfer of assets to B+L and the subsequent spinoff of B+L shares to Bausch Health was "a ploy intended to defraud" the plaintiffs in the Valeant litigation. (*Id.* ¶ 94.) The Amended Complaint sets forth the reasoning for why Defendants did this. (*See, e.g.*, *id.* ¶ 95-101.)[10]

### 3.    Alleged Materially False and Misleading Statements

In addition to the already mentioned misrepresentations, the Amended Complaint provides a detailed review of the alleged misstatements and omissions pertaining to the B+L spinoff and the Valeant litigation and liabilities. (*Id.* ¶ 136.) Notably, when discussing the spinoff, the Company wrote in a press release that it is "committed to taking action to unlock what [it] see[s] as unrecognized value in Bausch Health shares, and [it] believe[s] that separating [the] business into two highly focused, stand-alone companies is the way to accomplish that goal." (*Id.* ¶ 136.) Plaintiffs claim that this statement was misleading because it omitted facts that the spinoff was unlikely to materialize and that the real purpose of the spinoff was to defraud plaintiffs in the Valeant litigation. (*Id.* ¶ 137.) Additionally, Defendants made several statements to the effect of the previous lawsuits being behind them, which purportedly portrayed a false narrative to investors given that the Company still "faced massive liability." (*Id.* ¶¶ 138, 140.)

With respect to the spinoff, CFO Herendeen stated that "B+L and [Bausch Health] will emerge from the spin process with appropriate capital structures." (*Id.* ¶ 142.) Plaintiffs also allege that Defendants misrepresented its leverage post spinoff. (*Id.* ¶¶ 146, 147, 149.) On March 9, 2021, at a Barclays Global Healthcare conference, Chairman Papa stated that once the spinoff occurs, the Company thinks that it "will create the most value for [its] shareholders." (*Id.* ¶ 150.)

---

[10] The New Jersey Superior Court denied Defendant's Motion to Dismiss the fraudulent conveyance action. (*Id.* ¶ 99.)

Chairman Papa stated that "[w]e believe the better way is to go, as I said, spin B+L and take all the appropriate actions that I mentioned just before this, to ensure that we get both the B+L and the remaining business, both at an appropriate market capitalization for their capital structure." (*Id.*) Again, Plaintiffs allege that these statements were misleading because Defendants knew the spinoff was unlikely to occur given the vulnerable Xifaxan patents, and the spinoff was not reasonably calculated or intended to create value for shareholders. (*Id.* ¶ 151.)

Later in February 2023, CEO Appio stated that "[w]e continue to believe the separation of Bausch + Lomb makes strategic sense. We remain committed to creating [two] strong companies and, therefore, to ensuring the financial stability of both companies on a stand-alone basis." (*Id.* ¶ 156.) CEO Appio also stated that "we need to create [two] strong companies here. . . . we believe it's in the best interest of stakeholders to continue on with our strategic alternatives of what we've laid out." (*Id.*)

With respect to the Xifaxan litigation, Chairman Papa stated on the Company's Q1 2020 earnings call that "all intellectual property protecting Xifaxan remains intact, and we preserved market exclusivity until 2028." (*Id.* ¶ 160.) According to Plaintiffs, these statements were misleading because (1) the patents were vulnerable to a ruling of invalidity by a court, (2) Norwich had filed with the FDA to market a generic Xifaxan, and (3) Norwich sent letters to Salix indicating that its patents were invalid prior to the Q1 call. (*Id.* ¶ 161.) At future conferences and on calls, Chairman Papa discussed the strength of the Company's intellectual property, again without stating any issues related to Norwich's patent challenges. And when the Company announced the District of Delaware's ruling regarding the patent, Plaintiffs allege that it did not state that the FDA could still grant Norwich tentative approval for its generic drug and that Norwich could seek final approval by appealing to the Federal Circuit. (*Id.* ¶ 177.)

4.    <u>Scienter Allegations</u>

As alleged in the Amended Complaint, Defendants acted with scienter because Defendants "knew, or recklessly disregarded, that the public documents and statements they issued or disseminated . . . were materially false." (*Id.* ¶ 179.)  Plaintiffs allege that Chairman Papa, CFO Herendeen, and CEO Appio directly participated in the management of the Company and therefore knew of its misrepresentations.  (*Id.* ¶¶ 181, 182, 183.)  Plaintiffs also claim that the spinoff was never to reduce debts or improve shareholder value; instead, it was to transfer Bausch Health assets to B+L to avoid exposing them as a source of recovery in the Valeant litigation.  (*Id.* ¶ 185.)  This fraudulent scheme, according to Plaintiffs, is supported by the fraudulent conveyance action in New Jersey state court, the fact that the Company gave away B+L, and the disproportionately leveraged ratios by Defendants.  (*Id.* ¶ 185.)  As a final matter related to scienter, Plaintiffs allege that scienter is supported by (1) the high level of executive turnover during the Class Period, (2) the fact that Chairman Papa, CFO Herendeen, and CEO Appio knew of all the facts before making statements but refused to state those facts, and (3) the fact that Defendants engaged in fraud "to enable them to raise capital for the Company through the issuance of refinancing of billions of dollars of bonds."  (*Id.* ¶¶ 191–196.)

In short, the Amended Complaint alleges two counts: Count One is a violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Count Two is a violation of Section 20(a) of the Exchange Act against the individual Defendants.

## II.    **JURISDICTION**

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa.

### III.    MOTION FOR LEAVE TO FILE A SUR-REPLY

The Court will first address Plaintiffs' Motion for leave to file a Sur-Reply because a decision by the Court on that Motion impacts which papers the Court considers when addressing Defendants' Motion to Dismiss.  As a rule, sur-replies may not be submitted without permission from the Court, and permission is generally denied where the record and prior submissions are deemed sufficient.  L. Civ. R. 7.1(d)(6); *Kearney Partners Fund, LLC v. United States*, Civ. No. 11-4075, 2012 WL 8134754, at \*1 n.1 (D.N.J. July 13, 2012).  Reasons this district has permitted sur-replies to be filed include affording a party an opportunity to address a new issue in the "interest of completeness," for "complicated and novel legal questions," or for unusual circumstances.  *See, e.g., Christion v. Pressler & Pressler, LLP*, Civ. No. 07–1938, 2010 WL 988547, at \*2 n.3 (D.N.J. Mar.12, 2010); *United States v. Lane Labs-USA*, 324 F. Supp. 2d 547, 563 (D.N.J. 2004); *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 290 (D.N.J. 2000).

Here, Plaintiffs have failed to demonstrate that a sur-reply is necessary, as the parties' arguments were sufficiently addressed in the original moving papers.  Defendants have not raised new arguments in their Reply—contrary to Plaintiffs' position—and Plaintiffs have not made a sufficient showing that a sur-reply is otherwise merited.  Consequently, Plaintiffs' Sur-Reply Motion will be **DENIED**, and the Court will not consider their sur-reply when addressing Defendants' Motion to Dismiss.

### IV.    MOTION TO DISMISS

#### A.    Rule 12(b)(6)

Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and

the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (abrogated on other grounds)).

A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of the plaintiff's well-pled factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court, however, may ignore legal conclusions or factually unsupported accusations that merely state the defendant unlawfully harmed the plaintiff. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 663). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

There is also a three-step process with respect to motions to dismiss in a Section 10(b) action under the Securities Exchange Act, as is the case here: First, as with any Rule 12(b)(6) motion, courts must "accept all factual allegations in the complaint as true." *Winer Family Tr. v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007). Second, "courts must consider the complaint in its entirety." *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

And third, in determining whether the pled facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences. *Id.*

### B.     The PSLRA and Rule 9

Fraud-based claims brought under the Securities Exchange Act and alleged as part of a private securities class action are additionally subject to the heightened pleading requirements of both Rule 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u, *et seq.*, (the "PSLRA").[11] *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276–77 (3d Cir. 2006).

Under Rule 9(b), a plaintiff must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see Frederico v. Home Depot*, 507 F.3d 188, 200–02 (3d Cir. 2007) (noting that a court may grant a motion to dismiss a fraud-based claim if the plaintiff fails to plead with the required particularity). Particularity requires sufficient details to put the defendant "on notice of the precise misconduct with which [it is] charged." *Id.* at 201 (alteration in original) (quoting *Lum v. Bank of Am.*, 261 F.3d 217, 223–24 (3d Cir. 2004) (abrogated on other grounds)) (internal quotation marks omitted). At a minimum, Rule 9(b) requires a plaintiff to allege the "essential factual background that would accompany the first paragraph of any newspaper story—that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema Specialties*, 438 F.3d at 276–77.

The PSLRA, which has an even higher pleading standard than Rule 9(b), is targeted at preventing abusive securities litigation. *See Tellabs, Inc.*, 551 U.S. at 313 ("Private securities fraud actions . . . if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law."). The PSLRA provides two

---

[11] Congress enacted the PSLRA in 1995 to address "perceived abuses of the class-action vehicle involving nationally traded securities" and to help "identify ways in which the class-action device was being used to injure 'the entire U.S. economy.'" *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006) (quoting H. R. Conf. Rep. No. 104–369, p. 31 (1995)).

distinct pleading requirements, both of which must be met for a securities complaint to survive a motion to dismiss. *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009). First, under 15 U.S.C. § 78u–4(b)(1), the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Id.* (quoting *Winer Family Tr.*, 503 F.3d at 326) (internal quotation marks omitted). Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (quoting 15 U.S.C. § 78u–4(b)(2)) (internal quotation marks omitted).

Both provisions of the PSLRA require facts to be pled with "particularity." *Id.* at 253. As such, this particularity language echoes the requirements of Rule 9(b). *Id.* Indeed, although the PSLRA replaces Rule 9(b) as the pleading standard governing private securities class actions, Rule 9(b)'s particularity requirement "is comparable to and effectively subsumed by" PSLRA § 78u–4(b)(1). *Id.* (discussing the PSLRA's requirement that a plaintiff plead the "who, what, when, where and how: the first paragraph of any newspaper story") (internal quotation marks omitted).

## V.    **DISCUSSION**

In the Motion, Defendants argue that the Amended Complaint "impermissibly resorts to general speculation about the Company and relies on unproven allegations." (Moving Br. at 1.) Defendants add that the statements that Plaintiffs allege to be misleading are forward-looking inactionable statements of opinion or belief. (*Id.* at 2.) Defendants also argue that Plaintiffs have not sufficiently alleged that some of the purportedly misleading statements were false when made. (*Id.* at 9.) Regarding the statements about Xifaxan, Defendants claim that courts have held that publicly traded companies are allowed to express their legal positions with confidence without the

risk of an actionable representation.  (*Id.* at 11 (citing *In re Glaxo SmithKline PLC Sec. Litig.*, 2006 U.S. Dist. LEXIS 73893, at *32 (S.D.N.Y. Oct. 6, 2006))).  Defendants also contend that Plaintiffs failed to plead an inference of scienter for the alleged acts of fraud.  (*Id.* at 3, 17 (relying on *Lewakowski v. Aquestive Therapeutics, Inc.*, Civ. No. 21-3751, 2023 WL 2496504, at *1 (D.N.J. Mar. 14, 2023))).  On this point, Defendants claim that all facts regarding the litigation and Opt-Out Plaintiffs from the Valeant suit were known to the public, so any subsequent statements cannot be misleading.  (*Id.* at 13.)  With respect to loss causation, Defendants argue that Plaintiffs have failed to plead how the "relevant truth concealed by the misrepresentations was made known to the public and that the stock price declined as a result."  (*Id.* at 3.)  Lastly, Defendants argue that Plaintiffs have failed to plead scheme liability and that each defendant had a role in making the challenged statements.  (*Id.* at 28, 29.)

Plaintiffs oppose Defendants' Motion, arguing that as an initial matter, the Amended Complaint properly alleges facts based on the state court fraudulent conveyance action as there is no bar to relying on factual allegations from other complaints.  (Opp'n Br. 12–13.)  Plaintiffs argue that it has properly pled a scheme to defraud by articulating that Defendants (1) transferred valuable assets to B+L before the spinoff, and (2) disproportionately leveraged Bausch Health. (*Id.* at 16.)  Relying on the New Jersey Superior Court decision, *GMO Trust et al. v. Bausch Health Companies Inc., et al.*, Docket No. C-012010-22, Plaintiffs claim that they have sufficiently pled fraudulent intent.  (*Id.* at 16.)  Plaintiffs further argue that they have alleged false and misleading statements.  (*Id.* at 18.)  For example, Plaintiffs contend that Defendants stated there was a legitimate purpose for the spinoff, when there never was.  (*Id.* at 18.)  Additionally, Plaintiffs refute Defendants' forward-looking opinion argument by explaining that the statements were not specific, did not discredit the misrepresentation, and did not include cautionary language.  (*Id.* at

19.)  Plaintiffs moreover claim that they alleged a strong inference of scienter by showing a "knowing or reckless state of mind."  (*Id.* at 24.)  Lastly, Plaintiffs argue that they properly alleged loss causation because it showed investors were harmed through Defendants' fraudulent scheme and material misrepresentations.  (*Id.* at 28–29.)[12]

### A.    Violation of Securities Exchange Act Section 10(b) (Count One)

In Count One of their Amended Complaint, Plaintiffs allege a violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 of the regulations promulgated by the SEC under the Act.  (*See* Am. Compl.)  The Amended Complaint alleges that over the proposed class period, Defendants (1) did not sufficiently inform investors about the Xifaxan patent litigation and problems over its patent exclusivity, (2) minimized and inadequately disclosed Bausch Health's liability in the Valeant litigation, and (3) had a fraudulent motive in making statements about the success of the B+L spinoff, knowing at all times that it would fail.  (*See generally id.*)

The private right of action under Section 10(b) and Rule 10b-5 "creates liability for false or misleading statements or omissions of material fact that affect trading on the secondary market." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997).  To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation."  *Gold v. Ford Motor Co.*, 577 F. App'x 120, 122 (3d Cir. 2014) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)).  In relevant part, Rule 10b-5 makes it unlawful for an individual "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the

---

[12] In a Reply Brief, Defendants reiterate that Plaintiffs have failed to identify any misrepresentations or omissions, there are no particularized facts of scienter, the Amended Complaint insufficiently pleads scheme liability as to each individual Defendant, and the Amended Complaint fails to demonstrate loss causation.  (Reply Br. at 1–2.)

circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(b).

The alleged material misstatements in the Amended Complaint can be separated into two categories related to (1) the B+L spinoff and (2) the Xifaxan litigation.  The Court will analyze each of these categories in turn.

### 1.    Spinoff Statements

#### a)    Safe-harbor

Defendants argue that many of their statements related to the B+L spinoff are not misleading because they are forward-looking statements protected by *Omnicare, Inc. v. Laborers District Council Construction Industries Pension Fund*, 575 U.S. 175 (2015), and the PSLRA's safe-harbor provision.  (Moving Br. at 13.)  For the reasons that follow, the Court agrees in some respects.

"In addition to establishing a heightened pleading standard, the PSLRA provides a so-called 'safe harbor' that immunizes certain 'forward-looking' statements from § 10(b) liability." *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d Cir. 2016).  "The term 'forward-looking statement' is broadly defined" in the PSLRA.  *See Avaya*, 564 F.3d at 255.  The definition captures a wide range of statements, including those "containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items"; statements of "the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer"; or statements of "future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the [SEC]."  *Id.* (quoting 15 U.S.C. § 78u-5(i)(1)(A)-(D)).  "[A] mixed present/future statement is not entitled to the safe harbor with

respect to the part of the statement that refers to the present." *Id.* (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc. (Tellabs II)*, 513 F.3d 702, 708 (7th Cir. 2008)).

When the alleged misleading statement at issue is an opinion or a belief, the Supreme Court has clarified that whether that statement is misleading is an "objective" inquiry that "depends on the perspective of a reasonable investor." *Omnicare*, 575 U.S. at 186–87.  Although *Omnicare* examined claims under Section 11 of the Securities Exchange Act of 1933, these principles are "not unique to § 11." *Id.* at 191.  Rather, "[t]hey inhere, too, in much common law respecting the tort of misrepresentation," *id.*, and are therefore arguably applicable to claims under Section 10(b) as well.  *See In re Merck & Co.*, Civ. No. 05-1151, 2015 WL 2250472, at *9 (D.N.J. May 13, 2015) (finding *Omnicare*'s analysis of misleading opinions instructive, to some extent, on the viability of claims regarding misleading opinions under Section 10b).  Furthermore, the Third Circuit has deemed determinative that "[o]pinions are only actionable under securities laws [including Section 10(b),] if they are not honestly believed and lack a reasonable basis." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 174 (3d Cir. 2014).

Like forward-looking statements, opinions, and beliefs, a defendant may not be held liable for an alleged misrepresentation that consists of nothing more than vague and nonspecific expressions of corporate optimism.  *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999).  Such statements "constitute no more than 'puffery' and are understood by reasonable investors as such." *Id.*  (quoting *Burlington*, 114 F.3d at 1428 n.14).  Thus, if a false or misleading statement is "too vague to ascertain anything on which a reasonable investor might rely," it is inactionable as corporate puffery.  *In re Aetna, Inc, Sec. Litig.*, 617 F.3d 272, 284 (3d Cir. 2010).

Here, based on a complete and liberal reading of the Amended Complaint, many of the alleged misleading statements relied upon by Plaintiffs to show fraud or that the spinoff was

unlikely to occur are forward-looking statements of opinion and belief.  For example, the statement alleged in Paragraph 136 provides that the Company is "committed to taking action to unlock what we see as unrecognized value in Bausch Health shares, and we believe that separating our business into two highly focused stand-alone companies is the way to accomplish that goal."  (Am. Compl. ¶ 136.)   Contrary to Plaintiffs' contentions, this statement is an inactionable forward-looking statement because it states what the Company believes, involves projections of revenue, income, earnings, and capital expenditures, and is merely corporate optimism pertaining to future business plans. *See Avaya*, 564 F.3d at 255.

All of Defendants' statements explaining the Company's goals for the B+L spinoff are also inactionable forward-looking statements.  (*See, e.g.*, ¶ 142 ("[O]ur goal is that both B+L and [Bausch Health] will emerge from the spin process with appropriate capital structure"); ¶¶ 144, 146, 148, 150 ("And once we spinoff B+L, we think [we] will create the most value for our shareholders"); ¶¶ 154, 156 ("We continue to believe the separation of Bausch + Lomb makes strategic sense"), ¶ 158 ("[W]e believe the separation of Bausch & Lomb makes strategic sense, and we remain focused on creating [two] companies"), ¶ 168, ¶ 174.)  These statements (1) involve the Company's hopes, wishes, and thoughts, (2) relate to capital structure, revenue, income, and (3) address plans and objectives of management for future operations.  Thus, the statements are forward-looking and protected by the PSLRA's safe-harbor provision.  In short, the Amended Complaint fails to non-speculatively demonstrate how these statements pertaining to the spinoff were material misrepresentations or omissions not protected by the PSLRA.  *See Gold*, 577 F. App'x at 122.

Plaintiffs argue that many of Defendants' statements were recklessly made and unrealistic and should not be protected.  (*See id.* ¶ 149.)  Plaintiffs also contend that many of the statements

19

were not identified as "forward-looking statements" when made, and that there is no cautionary language in the statements; thus, they cannot be protected by the PSLRA's safe-harbor provision. (*Id.* ¶ 178.)  The Court rejects Plaintiffs' position because it is mere hindsight speculation to state that Defendants knew their projections were "unrealistic and inconsistent with the real reasons for the spinoff."  (*See id.*)  As explained, the statements are classic forward-looking statements. Additionally, Defendants do not have to use the exact phrase, "forward-looking statement" when making such statements, contrary to Plaintiffs' position.  Such an argument ignores the fact that (1) there can be statements meeting the "forward-looking" definition, without the use of that term, and (2) the definition of "forward-looking" is broad.

Plaintiffs also argue that they have properly pled a scheme to defraud by explaining that Defendants (1) transferred valuable assets to B+L before the spinoff, and (2) disproportionately leveraged Bausch Health.  (Opp'n Br. at 16.)  In part, Plaintiffs rely on the state court fraudulent conveyance action.  (*Id.* at 12–13.)  The Court takes no position on whether Plaintiffs can permissibly cite allegations from another action.  Irrespective of that, however, the Court concludes that any allegation of fraud is speculative and not properly pled to overcome the PSLRA's safe-harbor.  There has been no decision on the merits in the New Jersey state fraudulent conveyance action and the statements alleged pertaining to a fraud scheme do not support a claim for fraud under the PSLRA or Rule 9.  In fact, in one statement Plaintiff relies on to show fraud, Chairman Papa explains that "we still have a couple of opt outs that we have to work our way through, but that particular $1.2 billion has been fully funded."  (Am. Compl. ¶ 152.)  This information satisfies the PSLRA and is a sufficient, non-fraudulent explanation of the Company's liabilities and projections at the current time.  At best, the statements relied upon by Plaintiffs to show fraud are merely expressions of corporate optimism.  *See In re Advanta*, 180 F.3d at 538.

Accordingly, the Court finds that Paragraphs 136, 142, 144, 146, 148, 150, 152, 154, 156, 158, 168, and 174 of the Amended Complaint are forward-looking statements.  Of the remaining spinoff related statements, the Court finds that they fall outside the PSLRA's safe-harbor provision because, for reasons to be explained later, they omit important facts that a reasonable investor would want to know and misleadingly state that bad news is in the rearview.  (*See* Am. Compl. ¶¶ 138, 139.)

b)    <u>Material Misrepresentation</u>

To plead liability in a Section 10b action, a plaintiff must allege, among other elements to make out a prima facie case, a material misrepresentation or omission.  *See Gold*, 577 F. App'x at 122.  Generally, information is material if it would be important to a reasonable investor in making investment decisions.  *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000).  An omitted fact is material if there is a substantial likelihood that a reasonable investor would have viewed its disclosure as "having significantly altered the total mix of information available to that investor." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 280 n.11 (3d Cir. 1992) (internal quotation marks omitted).  A duty to disclose an omitted material fact arises only when disclosure would be necessary to make the statement "not misleading" in "light of the circumstances under which they were made."  *City of Edinburgh Council*, 754 F.3d at 174 (internal quotation marks omitted). Because materiality is a mixed question of law and fact, it is appropriate for a district court to dismiss allegations of misrepresentations or omissions as inactionable as a matter of law "[o]nly if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality."  *Shapiro*, 964 F.2d at 280 n.11.

Here, as briefly discussed, of the remaining statements that are not protected by the PSLRA's safe-harbor provision, the Amended Complaint "specif[ies] each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and

belief, all facts supporting that belief with particularity." *Avaya*, 564 F.3d at 252. The Amended Complaint sets forth the alleged materially false and misleading statements made by Defendants, and provides explanations as to why those statements are misleading. (Am. Compl. ¶¶ 138, 139.) Each statement is identified via quotation marks and often bolded for emphasis, putting Defendants "on notice of the precise misconduct with which [Defendant is] charged." (*Id.*); *see Frederico*, 507 F.3d at 200–02.

For example, Plaintiffs allege that Defendants made multiple statements asserting that the liability exposure with respect to Valeant was "behind the Company." (*See, e.g.*, Am. Compl. ¶¶ 138, 139). These statements were misleading because, as Plaintiffs point out, they omit adverse facts that appear to be known to Defendants that a reasonable investor would want to know. (*See id.* ¶ 140.) It is true that some of the information related to the liability is known to the public and could be found via diligent research; however, Plaintiffs have alleged at this stage of the proceedings sufficient facts that the two statements in the Amended Complaint at Paragraphs 138 and 139 are not forward-looking and instead are material misrepresentations. *See Shapiro*, 964 F.2d at 280 n.11.

    c) <u>Scienter</u>

Defendants next argue that Plaintiffs have not pled scienter as to each Defendant. The Court considers scienter only with respect to Paragraphs 138 and 139 of the Amended Complaint for the reasons set forth above. "Scienter," refers to the "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). The scienter pleading standard of 15 U.S.C. § 78u–4(b)(2) requires a plaintiff to allege facts giving rise to a "strong inference of either reckless or conscious behavior." *Avaya*, 564 F.3d at 267 (quoting *In re Advanta*, 180 F.3d at 534–35) (internal quotation marks omitted). The Third Circuit defines "recklessness" as conduct involving "not merely simple, or even inexcusable negligence, but an

extreme departure from the standard of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that [the defendant] must have been aware of it." *McLean v. Alexander,* 599 F.2d 1190, 1197 (3d Cir. 1979) (adopting definition for reckless conduct associated with either omissions or misstatements in the context of suits under Section 10(b) and Rule 10b-5).

When determining whether scienter is properly pled, courts must weigh the "plausible nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 310. A "strong inference" of scienter is one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314, 324 ("The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." (internal quotation marks omitted)); *see also id.* at 323 ("the court must take into account plausible opposing inferences."). Although courts "aggregate the allegations in the complaint to determine whether [they] create[] a strong inference of scienter, plaintiffs must create this inference with respect to each individual defendant in multiple defendant cases." *Winer Family Tr.*, 503 F.3d at 337.

Moreover, motive must be supported by facts stated "with particularity"; "[b]lanket assertions of motive and opportunity" will not suffice, and "catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004). Notably, allegations based on "[i]ncentive compensation is a common practice," and a desire for executives to maintain their corporate positions is universal among corporate executives; thus, "[n]either motivation can be the basis of a fraud charge." *In re Honeywell Int'l, Inc. Sec. Litig.*, 182 F. Supp. 2d 414, 427–28 (D.N.J. 2002) (citing *Chill v. General Elec. Co.,* 101 F.3d 263, 268

(2d Cir. 1996)).  Similarly, the desire to show the success of a recent transaction such as a merger is insufficient.  *Id.* (citing *Phillips v. LCI International, Inc.,* 190 F.3d 609, 623 (4th Cir. 1999)).

Here, the Court agrees with Defendants that Plaintiffs have failed to adequately plead scienter as to each individual Defendant for the statements identified in Paragraphs 138 and 139.  The Amended Complaint—even when read in the "aggregate," *Winer Family Tr.*, 503 F.3d at 337—fails to put forth facts demonstrating "particularized allegations of a concrete and personal benefit to the individual defendants resulting from the fraud." *In re Bio-Tech. Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 586–87 (D.N.J. 2005).  The Amended Complaint does not include memoranda, internal reports, or communications suggesting that Defendants were aware that their statements were false.  *In re Intelligroup Sec. Litig.,* 527 F. Supp. 2d 262, 286 (D.N.J. 2007).  The Third Circuit has deemed a plaintiffs' bald assertions that defendants "must have known" an impermissible attempt to plead fraud by hindsight.  *California Pub. Emps' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 158 (3d Cir. 2004).

Importantly, a defendant's desire to raise capital is insufficient to show scienter.  Here, a full reading of the Amended Complaint demonstrates that Defendants attempted to raise capital and stated so during its statements about the spinoff.  *See Avaya*, 564 F.3d at 278–79 ("a general corporate desire to retire debt and raise funds and obtain credit on favorable terms . . . fail[s] to contribute meaningfully to a 'strong inference' of scienter" because "motivations to raise capital . . . are common to every company"); *see also In re MELA Scis., Inc. Sec. Litig.*, Civ. No. 10-8774, 2012 WL 4466604, at *5 (S.D.N.Y. Sept. 19, 2012) (holding that defendant's "capital raise[] during the Class Period" is "inadequate to support an allegation of intent to commit fraud").  There is nothing in the Amended Complaint besides conclusory allegations articulating how the statements pertaining to the spinoff were made falsely or dishonestly.  Instead, the statement in

Paragraph 139 provides that "we can put those in the rearview because that enables us to think about separating into the [two] companies where both will be well positioned . . . in order to drive forward from there."  (Am. Compl. ¶ 139.)  Even with the most liberal reading, Paragraphs 138 and 139 appear to demonstrate little more than a general corporate desire to retire debt and raise funds, which is insufficient to allege scienter.

Thus, the Court finds that Plaintiffs' inferences of scienter are not "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *See Tellabs*, 551 U.S. at 314. Although Plaintiffs state that there was high turnover and that the individual Defendants were seasoned executives, the connection between turnover and alleged fraud is mere speculation. Consequently, the Court finds that Plaintiffs have failed to sufficiently allege scienter when the Amended Complaint is read as a whole.  *See Lewakowski v. Aquestive Therapeutics, Inc.*, Civ. No. 21-3751, 2023 WL 2496504, at *1 (D.N.J. Mar. 14, 2023).

In sum, because the Court has found that scienter is not adequately pled with respect to the two remaining actionable statements, the Court will not proceed to loss causation.  Plaintiffs have failed to state a claim under Section 10(b) and corresponding Rule 10b-5 for Defendants' statements pertaining to the spinoff.

### 2.    Xifaxan Statements

The Court next addresses Plaintiffs' allegations that Defendants omitted important information related to the Xifaxan litigation.  For example, they claim that the Xifaxan patents were vulnerable to a ruling of invalidity, that Norwich was a serious competitor of the patents, and that the patents were not as strong as Defendants made investors believe.  (Am. Compl. ¶ 161.)

### a)    Safe-harbor

Just like the statements related to the spinoff, most of the statements pertaining to the Xifaxan litigation are forward-looking inactionable statements protected by the PSLRA's safe-

harbor provision.  For example, Chairman Papa stated during a conference call that the Company "believe[s] with Xifaxan, [it] ha[s] an opportunity . . . to give patients . . . long-term duration of treatment. . . . [The Company also] think[s] [it] ha[s] potentially a better solution for some of the patients with Xifaxan."  (*Id.* ¶ 162.)  This statement is a forward-looking statement of opinion or belief because it includes language pertaining to what Chairman Papa thinks or believes and is corporate optimism related to the patent.  There is nothing alleged in the Amended Complaint for the Court to conclude that such a statement was a material misrepresentation.

Additionally, Plaintiffs allege that Defendants misleadingly spoke about the strength of their patents and future success with the patents.  However, again, such statements are forward-looking.  (*See, e.g., id.* ¶ 164 ("We think that speaks absolute volumes about our intellectual property and the strength of that intellectual property"), ¶ 166 (explaining projections for the future), ¶ 168, ¶ 170, ¶172 (noting that the Company "remains confident in the strength of the Xifaxan patents and will continue to vigorously pursue this matter and defend its intellectual property"), ¶ 174 ("just looking out over the next [five] years . . ."), ¶ 176.)  The Court finds these statements to be forward-looking because they (1) provide what the Company thinks will happen in the future, (2) are statements of corporate optimism, and (3) express how the executives feel about certain business decisions and their legal positions regarding the patent litigation.  *See Avaya*, 564 F.3d at 255.  Accordingly, the Court finds that the statements set forth in Paragraphs 162, 164, 166, 168, 170, 172, 174, and 176 of the Amended Complaint are protected by the PSLRA's safe-harbor provision.

b)    Material Misrepresentation

That leaves only Paragraph 160 as to Xifaxan, which provides that on May 7, 2020, Chairman Papa stated on a call that "all intellectual property protecting Xifaxan remains intact, and we preserved market exclusivity until 2028."  (*Id.* ¶ 160.)  This statement is objectively true

and not misleading.  Additionally, the challenges to the Salix patents were publicly known and Defendants therefore have no duty to disclose those challenges.  *See In re Ocugen, Inc. Sec. Litig.*, App. No. 23-1570, 2024 WL 1209513, at *3 (3d Cir. Mar. 21, 2024).  Accordingly, because the Court finds that none of the statements related to the Xifaxan litigation are material misrepresentations, the Court need not address scienter, or loss causation with respect to this category of statements.

Based on the foregoing, the Court finds that Plaintiffs fail to plead a plausible violation of Section 10(b) and Rule 10b-5.  Count One will therefore be dismissed without prejudice.

### B.     Violation of Securities Exchange Act Section 20(a) (Count Two)

Moving to Count Two, to survive a motion to dismiss, a plaintiff bringing an action under Section 20(a) of the Securities Exchange Act must plead: "(1) an underlying primary violation by a controlled person or entity; (2) that [the defendants] exercised control over the primary violator; and (3) that the [d]efendants, as controlling persons, were in some meaningful sense culpable participants in the fraud."  *Wilson*, 195 F. Supp. 2d at 642.  In other words, "[l]iability under Section 20(a) is predicated upon an independent violation of [the Securities Exchange Act] or the rules or regulations thereunder."  *Id.* (quoting *In re Party City Secs. Litig.*, 147 F. Supp. 2d 282, 317 (D.N.J. 2001) (internal quotation marks omitted)).  Because the Court has found that there are no underlying primary violations under Section 10(b), the Court will also dismiss Count Two without prejudice.

## VI.     <u>CONCLUSION</u>

For the reasons stated above, the Court will **GRANT** Defendants' Motion to Dismiss (ECF No. 42) and **DENY** Plaintiffs' Motion for Leave to File a Sur-Reply (ECF No. 52.)  The Amended Complaint will be DISMISSED without prejudice.  Plaintiffs will be given leave to file a Second

Amended Complaint to address the deficiencies identified herein within 30 days.  An appropriate

Order will follow.


Date: February 12, 2025

<div style="margin-left:50%">

_s/ Zahid N. Quraishi_____

**ZAHID N. QURAISHI**

**UNITED STATES DISTRICT JUDGE**

</div>