SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
CHRISTOPHER L. AYERS
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: 973/639-9100
973/679-8656 (fax)
cseeger@seegerweiss.com
cayers@seegerweiss.com

Liaison Counsel

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| R. CASSIAN ANDERSON and DONNA S. PREVES,[1] Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> BAUSCH HEALTH COMPANIES INC., JOSEPH PAPA, and PAUL HERENDEEN, <br><br> Defendants. | No. 3:23-cv-03996-ZNQ-RLS <br><br> <u>CLASS ACTION</u> <br><br> SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW <br><br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

---

[1] As directed by the Court in its Opinion dated February 12, 2025, the case caption has been modified. *See* ECF No. 54 at 1 n.1

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all persons, other than Defendants (defined below), who purchased or otherwise acquired the common stock of Bausch Health Companies, Inc. ("Bausch Health" or the "Company") between May 7, 2020 and June 8, 2023, inclusive (the "Class Period"), asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].[2]

2.     Bausch Health is the successor to Valeant Pharmaceuticals International, Inc. ("Valeant").  In the wake of one of the most egregious securities frauds in history, Valeant replaced its senior management in 2016, and, in an effort to "leave the past behind" (according to *Reuters*), the Company changed its name in 2018 to Bausch Health.  After settling a class action for an outsized payment of $1.2 billion in November 2019, the Company led investors to believe it was finally ready to turn a new leaf.

3.     In truth, its troubles were far from over.  Bausch Health was still a sinking ship, kept afloat by a series of promises it knew it could not keep.  As these

---

[2] Unless otherwise noted, emphasis has been added and internal citations and quotations have been omitted.

buoys deflated one after another, the Company's stock price sank from over $30 per share in May 2021 to around $7 per share today – a staggering *77%* decline.

4.      The Company's strategy to recover from its Valeant past could be characterized as "fake it till you make it."  By downplaying the threats it faced on all sides – from legacy Valeant liability, the imminent loss of a lucrative patent, and more – Bausch Health hoped to procure vital financing and stabilize its balance sheet. This included the issuance and/or refinancing of over *$9 billion* of bonds during the Class Period, whose favorable terms depended on the Company's appearance of creditworthiness.  Thus, Defendants were motivated to conceal these credible threats to the Company's financial performance.

5.      The façade, however, could only last so long.  As investors learned of Bausch Health's multifaceted exposure, its financial goals slipped out of reach.  The problems concealed by Defendants thus exacerbated one another, materializing systemically in a domino effect.

6.      Specifically, Defendants concealed, downplayed, and/or misrepresented the following adverse facts, or failed to disclose facts that they had a duty to disclose by virtue of speaking on these topics:

(a)      that the Company still faced potentially billions of dollars in liability from Valeant shareholders who had opted-out of the class action settlement (the "Opt-Out Plaintiffs").  The settlement value of the Opt-Out Plaintiffs' claims was

estimated by *Bloomberg Intelligence* as of May 2022 to be $500-$800 million (based on damages of $4.2 billion), representing **85-140%** of Bausch Health's cash on hand;

(b)     that a much-hyped and anticipated "spin off" (*i.e.*, separation) of the Company's most valuable subsidiary, Bausch + Lomb ("B+L") – though touted as a financially prudent decoupling that would benefit *both* Bausch Health and B+L – would leave Bausch Health with dangerously high levels of debt. Indeed, Defendants' Class Period statements about the B+L spinoff created a duty to disclose that the real purpose of the B+L spinoff was to thwart the Opt-Out Plaintiffs' ability to collect a significant judgment or settlement; this was to be accomplished by shifting the Company's most valuable assets to B+L where they would be untouchable by the Opt-Out Plaintiffs. In response, several of the Opt-Out Plaintiffs sued Bausch Health in March 2022 under a "fraudulent conveyance" theory, seeking, *inter alia*, an injunction to prevent the completion of the spinoff (a claim that is now moving forward in the New Jersey state court case); and

(c)     that market exclusivity for Bausch Health's most valuable single product – a drug called Xifaxan, owned by Bausch Health's subsidiary Salix Pharmaceuticals, Ltd. ("Salix") – was seriously threatened, which would impact Bausch Health's financial performance, in particular, when (or if) the B+L spinoff would be completed, as Xifaxan was anticipated to be Bausch Health's most significant source of revenue after other assets were transferred to B+L.

Unbeknownst to investors, several of the most vital patents pertaining to Xifaxan were based on "obvious" research – which would cause Bausch Health to lose those patents. Indeed, this led the United States District Court for the District of Delaware to rule in July-August 2022 that those patents were invalid – exposing Bausch Health's most valuable anticipated post-spinoff revenue stream to generic competition. Defendants' positive statements about the strength of Bausch Health's patents pertaining to Xifaxan therefore created a duty to disclose the very real risk – known to Defendants but not to investors – that those patents could be invalidated. This, too, has hindered the B+L spinoff, because Bausch Health cannot let go of B+L if doing so would leave it without alternative sources of meaningful income.

7.    The Class Period begins on May 7, 2020, when Defendants misleadingly told investors that they "preserved market exclusivity" over Xifaxan "until 2028" – while making no mention of the ongoing and credible challenge to its patents by Norwich Pharmaceutical Inc. ("Norwich"), one of its competitors. Moreover, on May 12, 2020, Defendants downplayed the lingering threat of litigation from its Valeant past, assuring investors that the case was "resolved" and "behind us[.]" Then, on August 6, 2020, the Company announced plans to spin off B+L – causing Bausch Health shares to surge 30% in pre-market trading – while failing to disclose the spinoff's insidious purpose.

8.     Once these concealed problems were revealed and/or materialized, Bausch Health's stock price declined, injuring investors who had purchased Bausch Health shares at artificially inflated prices.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and Section 27 of the Exchange Act.

10.     Certain of the claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and SEC Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder.   Jurisdiction over the Exchange Act claims is conferred by Section 27 of the Exchange Act, 15 U.S.C. §78aa.

11.     Venue is proper in the Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C §1391(b).

12.     Bausch Health's headquarters is located at 400 Somerset Corporate Boulevard, Bridgewater, New Jersey.   Bausch Health conducts business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

13.     In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate

commerce, including, but not limited to, the mails, telephonic communications, and the facilities of the national securities markets.

## PARTIES

14.    Lead Plaintiff R. Cassian Anderson ("Anderson") purchased Bausch Health common stock during the Class Period, as set forth in the attached certification, which is incorporated by reference herein, and was damaged thereby.

15.    Lead Plaintiff Donna S. Preves ("Preves") purchased Bausch Health common stock during the Class Period, as set forth in her previously-filed certification, ECF No. 10-4, which is incorporated by reference herein, and was damaged thereby.

16.    Lead Plaintiffs Anderson and Preves are collectively referred to herein as "Plaintiffs."

17.    Defendant Bausch Health is a global healthcare conglomerate that develops, manufactures, and markets a broad range of pharmaceuticals and medical devices.  Bausch Health's common stock is traded on the New York Stock Exchange ("NYSE") under the symbol "BHC."

18.    Defendant Joseph Papa ("Papa") is Bausch Health's former Chairman and Chief Executive Officer ("CEO").  Papa joined Bausch Health in 2016, and remained as CEO until May 2022.  On or before May 10, 2022, Papa stepped down as CEO of Bausch Health to join B+L as CEO and Chair of its Board of Directors, while

remaining Chairman of Bausch Health's Board of Directors as well. The following month, on June 23, 2022, Papa stepped down from the Bausch Health Board. A month after that, on July 20, 2022, Papa stepped down from the B+L Board too, and announced he would step down as CEO of B+L after finding a replacement. Upon information and belief, Papa lives in New Jersey.

19.      Defendant Paul Herendeen ("Herendeen") is Bausch Health's former Chief Financial Officer ("CFO") and Executive Vice President. Herendeen joined Bausch Health in 2016 as CFO, and held that position until mid-2021. On or about June 1, 2021, Herendeen transitioned to the newly created role of Advisor to the Chairman and CEO, remaining an executive vice president and Section 16 officer of Bausch Health. (After Herendeen's transition, the role of CFO was assumed by non-party Sam Eldessouky. Eldessouky held the position for less than a year, transitioning in May 2022 to B+L, whereupon the role of Bausch Health CFO was assumed by non-party Tom Vadaketh. Vadaketh stepped down just over a year later, on or about October 13, 2023. John Barresi, previously the Company's Senior Vice President, Controller and Chief Accounting Officer, served as Interim CFO for the next ten months, until Jean-Jacques Charhon assumed the role full-time on or about August 19, 2024.

20.     Papa and Herendeen are collectively referred to herein as the "Individual Defendants."  Bausch Health and the Individual Defendants are collectively referred to herein as "Defendants."

21.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

22.     It is appropriate to treat Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Company's public filings, press releases, and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified in ¶¶17-19 above.  Each of the above officers and directors of Bausch Health, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and/or was privy to confidential proprietary information concerning

the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.

23.    As officers, directors, and controlling persons of a publicly-held company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, and which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded stock would be based upon truthful and accurate information.  Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

24.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public press releases, and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their executive and managerial positions and/or Board membership with Bausch Health, the

Individual Defendants each had access to the adverse undisclosed information about Bausch Health's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Bausch Health and its business materially false and misleading.

25.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained herein.

26.    Each Defendant is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Bausch Heath stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Bausch Health's financial reporting, business, operations, management and prospects, and the intrinsic value of Bausch Health's stock price; and (ii) caused Plaintiffs and

the Class to purchase Bausch Health's publicly-traded stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### A.    Company Background

27.    Bausch Health is a global healthcare conglomerate that develops, manufactures, and markets a broad range of pharmaceuticals and medical devices. During most of the relevant period, it derived a "substantial portion" of its revenues from the "core" business areas of eye-health, gastroenterology ("GI"), and dermatology.

28.    Specifically, prior to May 5, 2021, the Company's portfolio of products fell into four operating and reportable segments: (i) Bausch + Lomb/International; (ii) Salix; (iii) Ortho Dermatologics; and (iv) Diversified Products.

(a)    B+L/International comprised: (i) the B+L eye-care business (including surgical, consumer, and ophthalmology Rx); and (ii) most of the Company's non-U.S. sales;

(b)    Salix comprises U.S. sales of GI products;

(c)    Ortho Dermatologics comprises: (i) U.S. sales of Ortho Dermatologics (dermatological) products; and (ii) global sales of Solta Medical ("Solta") aesthetic devices; and

(d)     Diversified Products comprises U.S. sales of: (i) pharmaceutical products in the areas of neurology and certain other therapeutic classes; (ii) generic products; and (iii) dentistry products.

29.     As of May 2021, to pave the way for the planned separation of B+L, the B+L and International Rx segments were separated, resulting in a total of five reporting segments.

30.     According to the Company's 2022 Form 10-K, revenues for 2022, 2021 and 2020 were $8,124 million, $8,434 million and $8,027 million, respectively.  The breakdown of revenues by segment is presented as follows:

| (in millions) | 2022 | | 2021 | | 2020 | |
|---|---|---|---|---|---|---|
| | Amount | Pct. | Amount | Pct. | Amount | Pct. |
| Salix | $  2,090 | 26 % | $  2,074 | 24 % | $  1,904 | 24 % |
| International | 988 | 12 % | 1,166 | 14 % | 1,181 | 15 % |
| Solta Medical | 300 | 4 % | 308 | 4 % | 253 | 3 % |
| Diversified Products | 978 | 12 % | 1,121 | 13 % | 1,274 | 16 % |
| Bausch + Lomb | 3,768 | 46 % | 3,765 | 45 % | 3,415 | 42 % |
| Total revenues | $  8,124 | 100 % | $  8,434 | 100 % | $  8,027 | 100 % |

31.     The Company's capital structure (*i.e.*, the mix of debt and equity financing its assets) is overwhelmingly debt-heavy.  As of December 31, 2019, the Company had $33.8 billion of assets; on the other side of the ledger it showed total liabilities of $32.7 billion and equity of just $1.1 billion.  Within that $32.7 billion of liabilities, the non-current portion of long-term debt was $24.6 billion.

32.     This heavy debt load was an inheritance from Bausch Health's predecessor, Valeant, which borrowed huge sums of money to finance a series of acquisitions.  Between 2008 and 2016, Valeant completed more than 100 acquisitions

at a total cost of more than $30 billion. For instance, on December 11, 2012, Valeant acquired Medicis Pharmaceutical Corporation for $2.6 billion; on August 5, 2013, Valeant acquired Bausch & Lomb Holdings Incorporated for $8.7 billion; on April 1, 2015, Valeant acquired Salix for $14.5 billion; and on October 1, 2015, Valeant acquired Sprout Pharmaceuticals, Inc. for approximately $1 billion. As noted by *The New York Times* in March 2016, this "acquisition binge" "was financed by the $30 billion of debt that is now straining the company's balance sheet."

33.    An important financial metric, followed closely by both investors and creditors, is the ratio of non-current long-term debt to EBITDA[3] ("Net Leverage"). To illustrate, as of June 30, 2020, Bausch Health reported around $24.6 billion in debt, and around $3.275 billion trailing adjusted EBITDA for the prior 12 months. Its Net Leverage was thus about 7.5.

34.    This figure, like the Company's debt-to-equity ratio, is unusually high. To highlight the seriousness of Bausch Health's 7+ Net Leverage, *The Motley Fool* noted on March 11, 2021 that "[w]hen a company's financial leverage ratio is greater than 5, that usually indicates it's at serious risk of default."

---

[3]    EBITDA stands for earnings before interest, taxes, depreciation, and amortization. In other words, it is gross revenue minus cost of goods sold, salary expense, and a handful of other expenses. EBITDA is one of the most popular profitability metrics among market analysts.

35.    For context, a May 2022 report by RBC analysts gathered data on Bausch Health "comps," short for comparables.  Comps are peer companies which compete in Bausch Health's industry.  The mean and median Net Leverage ratios among pharmaceutical companies (Jazz, Teva, Perrigo, etc.) were 3.6x and 3.9x, respectively.  And for large-cap pharmaceuticals/biotech (Johnson & Johnson, Pfizer, etc.), the mean and median were 0.7x and 0.6x.

36.    As Herendeen acknowledged at a conference on January 13, 2020, "when you're levered in the high 6s, that's too high for your business.  We need to actively work to bring that down."  Papa echoed that, saying, "So yes, we have the higher leverage than we'd like, we acknowledge that.  But we're going to continue to work it down."

37.    A central theme in the Company's recovery from the Valeant era, therefore, is "deleveraging."  Valeant's debt-driven binge resulted in a company that was both over-leveraged and bloated.  The purported mission of current management has been to reduce that leverage and streamline the Company's balance sheet.

38.    Papa elaborated on May 12, 2020: "[W]e paid down over $8 billion of debt since I joined in 2016.  We recognize, though, that we still have significant amount of debt, and we're continuing to look to pay down the debt . . . .  So for example, we divested about $3.8 billion of assets, the proceeds that we received to pay down debt as one example."  Another reason for divestitures, according to Papa, was

that the whole of Bausch Health was valued by the market as being worth less than the sum of its parts.

39.    Such divestitures could take different forms, including asset sales, initial public offerings ("IPOs"), and spinoffs.  In an asset sale, assets or a subsidiary can be sold to another company or institution.  In an IPO, shares of a subsidiary can be sold to the public.  A spinoff typically entails shares of a subsidiary being given to the parent's shareholders via a stock dividend.

40.    Prior to the announcement of the B+L spinoff in August 2020, however, the Company had never conducted a spinoff for a major divestiture.  Rather, its major divestitures were effectuated via asset sale.  Thus, for example, the Company sold CeraVe, AcneFree and AMBI for $1.3 billion in March 2017; Dendreon Pharmaceuticals for $820 million in June 2017; iNova Pharmaceuticals for $930 million in September 2017; Obagi Medical Products for $190 million in November 2017; and in December 2017, it sold Sprout Pharmaceuticals for a 6% royalty on sales of a certain Sprout Pharmaceuticals product.

41.    The Company conducted no major divestitures in 2018, 2019, or 2020 (other than announcing in August 2020 the planned B+L spinoff).

42.    Papa elaborated on the Company's divestiture campaign during a June 10, 2020 conference call:

> [W]e divested $3.8 billion of asset proceeds in the first couple of years to ensure that we could reduce the debt.  Because one of the things that we

clearly do understand is, we have more depth than both the quantum and the absolute leverage of the debt than we would like.  And we've been working very diligently to pay down that debt.  Having said all that, I want to be clear, we are open to all the options to unlock the value including either asset sales or spinoffs, if we believe that will drive further shareholder value appreciation.  We're going to be open to all those potential actions because as we look at it, we believe that the sum of the parts of our Bausch health care business, most notably the Bausch + Lomb business, is significantly greater than what the current market expectation is.  And we look at Bausch + Lomb versus peers like Alcon or Cooper, and they're trading at an EBITDA multiple that is probably around twice what our overall Bausch Health is trading at. . . . We've reduced the debt from $32 billion.  We brought it down ballpark $8 billion of net debt, but we still know that's too much, and we're going to look to try to reduce that debt to unlock the value for our shareholders and do it with urgency as we think about the future of our company.

## B.    The Bausch + Lomb Spinoff

43.    Ostensibly for the reasons described above, the Company announced on August 6, 2020 that it intended to spin off B+L.[4]  The result of the spinoff would be the establishment of two separate companies: "A fully integrated, pure play eye-health company built on the iconic Bausch + Lomb brand and long history of innovation; and [a] diversified pharmaceutical company with leading positions in gastroenterology, aesthetics/dermatology, neurology and international pharmaceuticals."

---

[4]    In some sources or contexts, the term "B+L spinoff" refers to all the steps of the separation, including: (1) reorganization of Bausch Health subsidiaries to move the vision health business to B+L; (2) an IPO of approximately 10% of B+L stock, which took place in May 2022; and (3) a distribution by dividend of the remaining B+L stock to Bausch Health shareholders, which has yet to take place.  In other sources, the term spinoff refers specifically to step three, the stock dividend.  The two connotations are used interchangeably throughout this Complaint; where the distinction is material, it is made clear.

44.     During an earnings call the same day, Papa represented that although it was impossible to give an exact timeline, the B+L spinoff was expected to take roughly a year and a half.

45.     Because this was an idea that had been floated in the past, however, investors wondered why the Company decided now was suddenly the right time to move forward.   An analyst on the call asked, "So I know the potential of the separation is something we've discussed in the past, but elaborate a little bit more in terms of why now in terms of the decision, like what got you comfortable to kind of move forward with this at this point?"  Papa responded:

> So Chris, great question.  Why now?  So we've been working at this for 4 years.  What we felt we had to do is we had to get ourselves into a position where we can divest the noncore assets of about $4 billion, pay down a lot of debt, about $8 billion plus of pay down, manage the portfolio that we had.  We knew we were going to lose exclusivity on about $1.4 billion portfolio.  We had to get through all these legacy issues that were part of what we faced as a company, the legal issues that Christina and her team solved the Salix litigation, the Allergan litigation, the class action lawsuit, both in the United States and Canada, the SEC, Philidor accounting.  Great news is those are now behind us.
>
> * * * * *
>
> We said that we find ourselves with a portfolio of products that are somewhat an artifact of history that were put together through a number of acquisitions, and we said, what's the best way to get these portfolio of businesses to a place where we could grow these businesses organically over the long term?  And we felt that by putting them and separating them, so each of them could make those types of judgments and decisions and focus was the right long-term decision.  And that's really the simplicity of the timing question.

46.     Analysts accepted the rationales given by Defendants.  Analysts at J.P. Morgan, for example, dubbed the decision "'Operation Clean Break' – A reversal of years of acquisitions that were driven by what happened to be for sale and what the markets allowed to be largely debt-financed.  As management said today, BHC lines of business are a historical artifact, not held together by great industrial logic."

47.     Based on these rationales, analysts at numerous institutions, including Barclays, Cowen, Truist, and Guggenheim, viewed the decision favorably. J.P. Morgan analysts, in a separate report issued the same day, described it as a "clear value creating event for the story (despite likely a 12-18 month process), with a[] [sum-of-the-parts] analysis pointing to substantial upside to shares."

48.     The Company's stock price reflected positive sentiment as well, surging about 30% in pre-market trading on August 6, 2020.

49.     Analysts at Piper Sandler likewise considered the spinoff "logical given that the eye care segment, beyond the prescription (Rx) segment, hardly synergizes with the remaining businesses."  They also felt it "could unlock sustainable value."

50.     Crucially, however, the Piper Sandler analysts' optimism came with two caveats.  First, "we surmise, given the longer-term durability of the eye care business, that this business could shoulder more of BHC's debt burden."  Second, their projection assumed "reasonably good durability for the Rx business (*i.e.*, Xifaxan exclusivity to 2028)[.]"

51.    Defendants knew, but failed to disclose to investors, that neither of these conditions would hold true.

52.    On September 16, 2020, CFO Herendeen – noting that "several people questioned how, given our leverage, we could actually spin off the Eye Health business" – gave some more color on the separation plan.  The plan he laid out was to precede the spinoff with an IPO, selling roughly 20% of B+L.  While acknowledging that "there are a number of alternatives for any separation," Herendeen referred to the 20% IPO as "the plain vanilla" scenario, indicating that this was the default, expected course of action.

53.    "Importantly," he added, "for this scenario to work, the post-spin BHC leverage needs to be five handle, say approximately 5.5x trailing adjusted EBITDA.  And that means that pre-spin, because I explained -- excuse me, BHC Holdco leverage would need to be roughly 5.5x to facilitate the spin."

54.    This plan – 5.5x Net Leverage for Bausch Health – was reiterated several times in the following months.

55.    On February 12, 2021, Glenview Capital, a hedge fund which then owned approximately 6% of Bausch Health, wrote a public letter to Bausch Health management.  The letter criticized management's action plan to drive shareholder value: "Simply put, from an outsider's perspective, the action plan has been 100% plan, 0% action."  Among other things, Glenview urged Bausch Health to "seek

capital for an up to a [sic] _**40%**_ equity stake in [B+L] prior to its spin-off.  To be clear, we are recommending raising capital by selling a stake in the eyecare subsidiary, [B+L], at fair value . . . ." (emphasis added).  Glenview added that "this capital could come from a [special purpose acquisition company] merger partner, private equity firm, leading North American or global investment institutions or the IPO market."

56.    A March 2021 J.P. Morgan report also expressed some discomfort with the stated cap of 20%, preferring an equity raise of 30-35%.

57.    Thus, while Defendants wished to equitize only 20% of B+L, concerned investors and analysts recommended as much as twice that amount.

58.    On March 11, 2021, the Company announced that, effective June 1, 2021, CFO Herendeen would transition to the newly created role of Advisor to the chairman and CEO, and Sam Eldessouky would take Herendeen's place as CFO. Analysts at Bank of America looked askance at the "peculiar" timing:

> Per BHC, the CFO succession was unsurprising as he was nearing average retirement age (64) and well beyond initial tenure commitment (to 2018).  To us, the update comes as a bit of a surprise given BHC is in the middle of a major separation and the CFO's recent comments on a Dec. call suggested a desire to remain in a managerial capacity with RemainCo.[5]  Shareholder activist recently went public with critiques of mgmt's approach to the B&L spin, advocating for a faster timeline to B&L spin.

---

[5]  "RemainCo" refers to the remaining portion of Bausch Health after the spinoff.

59.    On May 4, 2021, the Company announced that it had completed internal accounting rearrangements necessary to move forward with the spinoff.  Specifically, the prior segment called B+L/International was broken out into two segments (for a total of five reporting segments versus the previous four).

60.    Also on May 4, 2021 – in a move described by analysts as "controversial" and a "surprise" – Defendants announced that, post-spin, Bausch Health would be almost *three times as leveraged* as B+L.  Investors had initially been led to believe the Net Leverage for B+L and Bausch Health would be 4x and 5.5x, respectively.  Defendants now revealed that those figures would actually be 2.5x and 6.5-6.7x.

61.    Analysts at Bank of America noted that this would leave Bausch Health "disproportionately" levered as compared to its peer companies.

62.    Analysts at Piper Sandler were likewise concerned: "we struggle with the exceedingly high leverage ratios for the pharma business that, in our view, are a recipe for a depressed valuation . . . ."

63.    On this news, Bausch Health stock dropped about 11% in a single day, closing on May 4, 2021 at $27.94, down from a closing price of $31.42 the day before.

64.    Importantly, Bank of America analysts noted that the higher Net Leverage target for Bausch Health would make the Company dangerously dependent

on Xifaxan: "In our view, mgmt's update that RemainCo will carry 6.5-6.7x net debt to EBITDA disproportionately levers pharma vs. peers. While leverage is in-line on a trailing/current year basis, the issue is the Xifaxan [loss of exclusivity] in 2028, or an est. ~50% of RemainCo EBITDA."

65.    Those analysts, like everyone else in the market, assumed the Xifaxan patents would at least be safe until 2028. Had Defendants disclosed the seriousness of the challenge by Norwich to Xifaxan's market exclusivity, analysts' valuations of Bausch Health would have been adversely impacted. (Norwich's challenge to Xifaxan's patents is discussed more fully below.)

66.    Defendants also announced that day that Bausch Health's current CEO and soon-to-be CFO, Papa and Eldessouky, would be leaving to join asset-rich B+L – even though their replacements at Bausch Health had not yet been chosen, and even though Eldessouky had not yet even *started* his tenure as CFO of Bausch Health.

67.    Notably, Defendants did not rule out the possibility of selling B+L outright. Analysts for H.C. Wainwright & Co. thus wrote on May 5, 2021 that "we believe that Bausch Health may be exploring the possibility of significantly paring down debt via the sale of B+L, particularly if the proceeds from such a transaction were to exceed $20B." They added, "From our vantage point, Bausch Health is making solid progress towards rendering its overall debt position eminently tractable; we believe that the possible sale of B+L could, if executed at a favorable price, enable

the legacy company (RemainCo) to move forward without the disadvantage of a crippling debt load." As will be discussed below, that did not happen.

68.    On August 3, 2021, Defendants announced plans for an IPO of Solta, Bausch Health's medical aesthetics subsidiary. The Solta IPO was, according to the press release, to be "an important step in" the B+L spinoff by helping pay down Bausch Health debt with the money raised from the IPO. Papa added on November 2, 2021 that the Solta IPO was expected to take place about a month before the B+L IPO.

69.    On January 13, 2022, Defendants filed an S-1 for the B+L IPO.

70.    On January 18, 2022, Defendants announced a credit agreement wherein some of the Company's outstanding debt would be refinanced. As per the agreement, B+L, even after its IPO, would initially be a "restricted"[6] subsidiary, to be designated "unrestricted" only upon Bausch Health achieving a 7.6 pro forma "Total Leverage Ratio." (Upon information and belief, the formula for calculating Total Leverage Ratio under the credit agreement seems to be largely similar to what is referred to

---

[6]    According to B+L's Form S-1 registration statement dated January 13, 2022, B+L was not a guarantor of Bausch Health's $20+ billion in outstanding indebtedness. However, its status as a "restricted" subsidiary did mean that its ability to take certain actions would be restricted by the terms of Bausch Health's credit facilities and indentures. These covenants restricted, among other things, B+L's ability to incur or guarantee indebtedness; make certain investments and acquisitions; merge or consolidate with another company; and transfer, sell, or otherwise dispose of assets.

herein as Net Leverage.)   Unrestricting B+L was a necessary step toward the full spinoff.

71.     On April 28, 2022, Bausch Health announced a price target of $21-24 per share for the upcoming B+L IPO, which was significantly lower than Defendants had led the market to expect.  Analysts at RBC noted that this would likely result in less deleveraging (debt reduction) for Bausch Health.

72.     RBC analysts noted that, given B+L's EBITDA, a pricing of $21-24 per share implies an EV/EBITDA multiple of about 11.5x-13.3x.[7]  This was well below what the RBC team felt was the fair multiple of 17.5x.  While the RBC analysts could not explain the entire discount, they did note that a portion of the discount below 17.5x was to be expected given, *inter alia*, the challenge to Xifaxan market exclusivity.

73.     On this news, Bausch Health stock slumped more than 7% over two days, closing April 27, 2022 at $20.56 per share and closing April 29, 2022 at $19.01.

74.     Things got worse the following week.

---

[7]     One way to determine the fair value of a company is its earnings power times some multiple.  If a company earns $1 million per year and an analyst thinks a proper multiplier, given the company's leverage and industry and so on, is 10x, then the analyst would value the company at $10 million.

75.    On May 5, 2022, after market close, the Company announced a finalized price of $18 per share for the B+L IPO.  Bausch Health thus raised only $630 million in the B+L IPO, far less than had been expected.

76.    An RBC analyst report released that day attributed the disappointing valuation to, among other things, "uncertainty related to the gXifaxan litigation and the lawsuit alleging fraudulent transfer of assets from BHC to B+L." (The fraudulent-transfer lawsuit is discussed in greater detail below.)

77.    On May 6, 2022, Defendants announced that Thomas Appio would take over as CEO of Bausch Health, and Papa, as previously announced, would become CEO of B+L.

78.    The May 6, 2022 press release further represented that "Mr. Papa will remain in the role of chairman of the Board of Directors for Bausch Health until the full separation of Bausch + Lomb[.]"  In fact, just a month and a half later – June 23, 2022 – Papa stepped down from the Bausch Health board effective immediately.  And then the next month, on July 20, 2022, Papa also stepped down from the board of B+L effective immediately, and announced he would step down as CEO of B+L after finding a replacement.

79.    On May 9, 2022, RBC issued another report, lowering its price target for Bausch Health from $32 per share to $21.

80.    Notably, RBC's new price target included, for the first time, a bifurcated valuation: "Given the uncertainty related to the gXifaxan litigation, our [sum-of-the-parts valuation] for BHC is now based on the average price under two different scenarios: the genericization of Xifaxan in 2026 (new) and 2028 (original)."  The RBC report elaborated as follows:

> One of the key factors that has contributed to the recent weakness in BHC shares is the deterioration in risk profile of BHC associated with the gXifaxan patent litigation with Norwich/Alvogen.  We believe the market's original view on the situation was one of tail risk, suggesting low risk but high impact in the case of a negative outcome for BHC. Post the trial, however, independent legal groups have noted material risk based on their view of the trial.

81.    The analysts identified several other items as having "important implications" for their sum-of-the-parts valuation.  One item on the list was the recent fraudulent conveyance action against the Company (discussed below), filed March 24, 2022.

82.    In response to RBC's commentary and reduced price target, Bausch Health stock dropped almost 20% in a single day, closing Friday, May 6, 2022 at $16.04 per share and closing Monday, May 9, 2022 at $12.90.

83.    Things continued to go wrong for the Company.  On June 16, 2022, Defendants announced they were suspending the Solta IPO "in light of challenging market conditions and other factors[.]"  (Defendants did not bother to explain why they *did* go forward with the B+L IPO notwithstanding those same challenging market

conditions.)  Additionally, as will be discussed more in depth below, in late July 2022, Bausch Health lost critical patents for its most valuable single product, Xifaxan.  This, in conjunction with other bad news that year, made the anticipated spinoff of the remaining 90% of B+L less likely to ever move forward.

84.    The reason for this correlation is as follows.  As already mentioned, Bausch Health gave its most valuable assets to B+L but gave it relatively minor liabilities, the result being that the spinoff would leave Bausch Health with very high debt ratios (made even worse by the disappointing IPO).  This, in turn, left no room for error: any reduction to Bausch Health's EBITDA would push its debt ratios to dangerously high levels.  The debt covenant mentioned above required Bausch Health's leverage ratios to be less than 7.6x in order for B+L to become an unrestricted entity (a necessary step toward the full spinoff), and, in any event, Bausch Health had already committed to an even lower leverage of 6.5-6.7x before it would spin off the remaining B+L shares.  By definition, every decrease in Bausch Health's EBITDA was an increase in its leverage ratios.  Thus, every piece of bad news further impeded the spinoff.

85.    These facts alone show that the spinoff did not make sense from a financial perspective and was being pursued for other reasons.  Indeed, the spinoff harmed Bausch Health's balance sheet and drastically *increased* its debt load – ***the***

*exact opposite of what the Company's divestiture campaign was meant to accomplish*.

86.     While Defendants made affirmative statements about the Spinoff and characterized the reasons for the Spinoff as a way to pay down debt and bring Bausch Health's leverage ratios to healthy levels, the truth – which was known to Defendants but not disclosed to investors – was that a central purpose of the Spinoff was to deny the Opt-Out Plaintiffs of a funding source from which to collect a potential judgment or settlement.  Defendants' affirmative statements about the reasons for the Spinoff created a duty for them to disclose this central purpose as well.

### 1.     A Purpose of the Spinoff Was to Deprive Legacy *In re Valeant* Opt-Out Plaintiffs of a Source of Recovery

87.     Although *Valeant* settled the securities fraud class action against it in 2019, dozens of institutional investors opted out of that class, choosing instead to pursue their own direct actions.

88.     The Opt-Out Plaintiffs allege damages totaling $4.2 billion (plus billions more in pre-judgment interest).  This potential liability far outweighs the entire market value of Bausch Health, which has a current market capitalization of approximately $2.5 billion.

89.     Bausch Health, Papa and Herendeen have known about this total exposure since early 2020.  As detailed above, their overarching focus was getting the Company back on track in the wake of the Valeant fiasco.  They were acutely attuned

to the Company's remaining debts, liabilities, and legacy legal exposure, discussing these topics constantly. *See, e.g.*, *supra* ¶42 (Papa discussing steps that he and the rest of the executive team had taken and would take to manage their legacy debt load); ¶¶36, 53 (Herendeen discussing leverage ratios).

90.    Moreover, the sheer magnitude of the Opt-Out Plaintiffs' claim is something that both Papa and Herendeen, as CEO and CFO, respectively, would have paid attention to it.  By 2022, the mere *settlement* value of the direct actions was estimated by *Bloomberg Intelligence* at a staggering $500-$800 million – suggesting actual damages many times higher.  It would be absurd to suggest that, just two years earlier, Papa and Herendeen thought those actions were immaterial.

91.    This is especially true given how involved and multifaceted the *Valeant* litigation was.  As of the end of 2019, there were about 500 entries on the lead docket[8]; and, on separate dockets, there were 33 direct actions against the Company, each involving numerous institutional plaintiffs (trusts, investment funds, pension funds, partnerships, companies, foundations, and so on).  Some of those direct actions were filed in 2016, some in 2017, some in 2018, and some in 2019 (and a few more were filed in 2020).

92.    As just one example, the Fraudulent Conveyance Plaintiffs claim that, in early 2020, in connection with the settlement of the class action and/or document

---

[8]    *Potter v. Valeant Pharms. Int'l, Inc. Litig.*, Case No. 3:15-cv-07658 (D.N.J.).

discovery in the opt-outs' direct actions, Bausch Health was provided access to trading data that verified that the plaintiffs to the direct actions had collectively suffered $4.2 billion in damages (plus billions more in pre-judgment interest).[9]  No doubt over the course of the lengthy and contentious *Valeant* saga, this and many other such interactions occurred.

93.     Finally, by Papa and Herendeen speaking authoritatively in response to questioning, and presenting themselves as knowledgeable about the extent of Bausch Health's legal exposure from Valeant-related litigation, it is reasonable to infer that Papa and Herendeen were, in fact, informed and knowledgeable about the true extent of such exposure.

94.     In short, Bausch Health, Papa and Herendeen knew in 2020 that Bausch Health's exposure to claims from the Opt-Out Plaintiffs was massive.

95.     Investors, by contrast, were kept in the dark.  Even market analysts – sophisticated financial experts widely regarded as the most reliable proxy for what "the market" knows – did not, for the most part, discuss the "opt-outs," "direct actions," or leftover Valeant liability until after March 2022, when the Fraudulent Conveyance Action was filed.  For instance, in December 2019, after the U.S. class action settled for $1.2 billion, RBC wrote that "the settlement removes the final

---

[9]     *See GMO Trust et al. v. Bausch Health Co. Inc. et al.*, SOM-C-012010-22, (N.J. Sup. Ct. Somerset Cnty. Dec. 22, 2022), Amended Complaint (the "*GMO Trust* AC") ¶92.

lingering overhang from the Valeant days" – apparently considering any opt-outs beneath notice.  RBC wrote substantially the same thing again on August 5, 2020, after the Company settled a Canadian class action (the November 2019 settlement was limited to U.S. shareholders).  Similarly, on August 3, 2020, after the Company announced it had settled a related SEC investigation based on the same underlying Valeant fraud, analysts at H.C. Wainwright breathed a sigh of relief: "From our vantage point, the final resolution of such a long-running investigation effectively puts an end to one of the most troublesome issues that had plagued Bausch Health's reputation and eliminates any risk that the Philidor controversy might have resulted in a huge fine."  Again, prior to the filing of the Fraudulent Conveyance Action in March 2022, few analysts, if any, said anything of substance about the dozens of outstanding direct actions.

96.     It is thus clear that analysts, unlike Papa and Herendeen, *did* think the direct actions were no big deal.

97.     Analysts' misapprehension was understandable, as Defendants did their best to mislead the market.  Throughout 2020 and 2021, Defendants Papa and Herendeen downplayed the Company's exposure to the Opt-Out Plaintiffs' claims, assuring investors there were only "some" or "a couple" of opt-outs and that the Valeant saga was essentially "in the rearview."  By May 2022, when the Opt-Out

Plaintiffs could no longer be ignored, CFO Tom Vadaketh finally admitted that there were a "sizable number" of opt outs.

98.    As of November 2021, twenty-one opt-out actions, involving dozens of institutional investors, remained underway.

99.    On March 24, 2022, sixty-two of these institutions, representing twelve of the twenty-one opt-out actions or $3 billion of the $4.2 billion claim (the "Fraudulent-Conveyance Plaintiffs"), filed a fraudulent conveyance action against the Company in state court, and on December 22, 2022 they filed an amended complaint. That action seeks, *inter alia*: (i) a declaratory judgment that the transfer of assets from Bausch Health to B+L, which has already happened, is voidable to the extent necessary to satisfy creditors' claims; and (ii) an injunction blocking the contemplated stock dividend.

100.    Essentially, the Fraudulent-Conveyance Plaintiffs maintain that the transfer of eye-care assets to B+L and the subsequent spinoff of B+L shares to Bausch Health shareholders was and is a ploy intended to defraud the Opt-Out Plaintiffs. The Fraudulent-Conveyance Plaintiffs allege that Defendants *intend* to jettison their most valuable assets and leave behind an empty shell incapable of satisfying the Opt-Out Plaintiffs' potential judgment.

101.    There are many reasons to believe this is in fact the case. *First and foremost*, if the purpose of the B+L spinoff was to pay down debt and bring Bausch

Health's leverage ratios to healthy levels, it would not make sense to *give away* the majority of B+L. This is especially true considering that Defendants had never previously engaged in such a transaction; the 2017 divestitures were all for cash (or royalties). If, on the other hand, the purpose of the B+L spinoff is to evade liability, it makes perfect sense. The whole point is to empty Bausch Health's coffers and to preserve the assets elsewhere.

102. *Second*, the sudden announcement of the spinoff and Defendants' urgency to complete it is consistent with the alleged fraudulent scheme. The Company had not conducted a major divestment since 2017 and each one of those had been a straightforward asset sale. Defendants' assertion that the timing was because they had resolved their securities fraud litigation exposure rings hollow because the Company still had a $4.2 billion-plus exposure.

103. *Third*, Defendants disproportionately leveraged Bausch Health and imposed relatively little debt on B+L – even though B+L was *more durable*, and thus more capable of shouldering debt, than Bausch Health. *See supra* ¶50; *infra* ¶162. Again, this suggests that the purpose of the separation was not to benefit Bausch Health, but rather to salvage what could be salvaged (B+L) and let the rest sink.

104. *Fourth*, Defendants' disproportionate leveraging of Bausch Health was also contrary to what they had led the market to expect. This last-minute bait and

switch is consistent with Defendants knowing that their true plans would have been met with investor opposition.

105. *Fifth*, it is also significant *which* liabilities Bausch Health kept. The *Valeant* opt-out actions are disclosed in the "Legal Proceedings" sections of Bausch Health's Form 10-Qs and 2022 Form 10-K, but not in B+L's. This discrepancy suggests that the separation was structured so that B+L would be insulated from those actions. This is corroborated by the Master Separation Agreement between Bausch Health and B+L, filed with the SEC in a Form 8-K on March 30, 2022. Under that agreement, liabilities (whether accrued or matured, contingent or otherwise and regardless of whether arising or accruing before, on or after the completion of the IPO) related to or arising out of the businesses and operations of the Bausch + Lomb business would be allocated to B+L. All other liabilities – presumably including legacy *Valeant* liability – would be retained by or transferred to Bausch Health or its subsidiaries.

106. *Sixth*, the 10% IPO of B+L was executed during the worst possible market conditions, which is one of the reasons so little money was raised. Defendants realized this, of course. As noted above, they had planned to launch an IPO of Solta, the Company's dermatology subsidiary, about a month *before* the B+L IPO. Yet the B+L IPO came and went in May 2022 without any Solta IPO, and then just a month later, in June 2022, Defendants announced they were suspending the Solta IPO

indefinitely "in light of challenging market conditions and other factors[.]" That Defendants nevertheless chose to move forward with the B+L IPO is inexplicable – unless the whole thing was a cover. Following through with the previously announced B+L IPO gave the spinoff process an air of legitimacy.

107. *Seventh*, Defendants initially led shareholders to believe they would sell 20% of B+L – with analysts and investors preferring as much as 40% – but in the end they sold just 10%. *Supra* ¶¶52-57. This is further proof that the given reason for the IPO was suspect. Selling only 10% assured the market that the spinoff had a legitimate business purpose, while at the same time preserving the vast majority of B+L for the upcoming stock dividend.

108. *Eighth*, Bausch Health's CEO and CFO, Papa and Eldessouky, deserted Bausch Health for B+L, further suggesting Defendants knew Bausch Health was a sinking ship and that B+L was their only life raft.

109. *Ninth*, under fraudulent conveyance law, courts look to factors called "badges of fraud" to determine whether a transferor intended to thwart or evade creditors. The Chancery Division of the New Jersey Superior Court, Somerset County, denied in part Defendants' motion to dismiss the fraudulent conveyance action, finding that the Fraudulent-Conveyance Plaintiffs adequately pled actual intent to defraud based on the following "badges":

(a)    the transfer of eye-care assets was to an "insider" (here, a subsidiary);

(b)    the transferee (B+L) remained under the transferor's (Bausch Health's) control after the transfer; and

(c)    the spinoff was initially announced just a few months after Bausch Health learned the magnitude of its liability to the Opt-Out Plaintiffs in early 2020.

110.    That action is still moving forward in discovery, though some plaintiffs have since settled.

### C.    Xifaxan Patent Litigation

### 2.    Generic Drugs and Substitution

111.    The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §301 *et seq.*, as amended by the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act") and the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, 21 U.S.C. §§355(b)(2) and 355G and 35 U.S.C. §271(e), establishes procedures designed to facilitate competition from lower-price generic drugs, while maintaining incentives for pharmaceutical companies to invest in developing new drugs.

112.    A company seeking to market a new pharmaceutical product must file a New Drug Application ("NDA") with the Food and Drug Administration ("FDA")

demonstrating the safety and efficacy of the new product. These NDA-based products generally are referred to as "brand-name drugs" or "branded drugs."

113.    A company seeking to market a generic version of a branded drug may file an Abbreviated New Drug Application ("ANDA") with the FDA and obtain approval without additional safety studies by showing that its generic product is therapeutically equivalent to the already-approved branded drug. 21 U.S.C. §355(i)(2)(A)(iv). A therapeutically equivalent generic drug is "AB-rated" to the branded drug, which means it is the same in active ingredient, dosage form, safety, strength, route of administration, quality, performance characteristics, and intended use.

### 3.    Defendants Knew Bausch Health's Xifaxan Patents Were in Serious Jeopardy, but Did Not Adequately Communicate This Risk to Investors

114.    Salix is one of the largest specialty pharmaceutical companies in the world committed to the prevention and treatment of gastrointestinal (GI) disorders and diseases. Salix is a wholly owned subsidiary of Bausch Health.

115.    Salix accounted for $1.9 billion, or 24% of Bausch Health's total revenue, in 2020; $2.1 billion, or 24-25%, of Bausch Health's total revenue, in 2021; and $2.1 billion, or 26% (49% excluding B+L), of Bausch Health's total revenue, in 2022.

116.    During the Class Period, Xifaxan was Salix's largest product, accounting for revenues of $1.6 billion, $1.6 billion and $1.4 billion for 2022, 2021 and 2020, respectively.  In percentage terms, this translates to approximately 81%, 79% and 78% of the Salix segment revenues (or approximately 21%, 19% and 18% of Bausch Health's overall revenues) for 2022, 2021 and 2020, respectively.

117.    Xifaxan is a brand name for a chemical compound called rifaximin. Salix holds a number of patents for Xifaxan, covering certain aspects of its chemical structure ("polymorphs") as well as certain usages ("indications" or "method patents" or "method of use patents").

118.    Xifaxan is "indicated" by the FDA to treat irritable bowel syndrome with diarrhea ("IBS-D"), hepatic encephalopathy ("HE"), and traveler's diarrhea. According to analyst reports by Cowen issued throughout the Class Period, "the IBS-D indication accounts for ~50% of the Xifaxan business and provides the highest growth opportunity"; HE accounts for 48.5%; and traveler's diarrhea the remaining 1.5%.

119.    Norwich is a wholly owned subsidiary of Alvogen PB Research and Development LLC ("Alvogen").  Alvogen is a privately owned U.S.-based company focused on developing, in-licensing, manufacturing and marketing pharmaceutical products.

120.    In February 2020, Defendants were advised that Norwich submitted an ANDA to the FDA for approval to market a generic version of Xifaxan for IBS-D in adults and HE recurrence in adults.  On February 14, 2020, Norwich sent a notice letter to Salix asserting that many of the patents covering Xifaxan are invalid and unenforceable.

121.    On March 26, 2020, in response to Norwich's letter, Bausch Health, through Salix, filed a complaint in the United States District Court for the District of Delaware against Norwich, alleging patent infringement for the use of twenty-six patents that cover Salix's branded Xifaxan 550 mg tablets.  *Salix Pharms., Ltd. v. Norwich Pharms., Inc.*, Case No. 1:20-cv-00430-RGA (D. Del.) (ECF No. 1).  Salix narrowed its case to seven patents, which covered a polymorphic form of Xifaxan and methods treating IBS-D and HE in adults.  The polymorphic patents are patents that claim polymorphic forms of Xifaxan.  Polymorphs are different crystal forms of the same compound.

122.    On June 1, 2020, Norwich filed an Answer denying the allegations, and Counterclaim, alleging the patents were invalid as obvious.

123.    A patent will be found invalid as obvious under 35 U.S.C §103 if "the claimed invention as a whole would have been obvious to a person of ordinary skill in the art [("POSA")] at the time the invention was made."  *Kahn v. Gen. Motors Corp.*, 135 F. 3d 1472, 1479 (Fed. Cir. 1998).  "Obviousness is a question of law based on

underlying factual findings: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective considerations of nonobviousness." *In re Morsa*, 713 F. 3d 104, 109 (Fed. Cir. 2013) (citations omitted).

124.    In patent law, a POSA is a hypothetical, legal construct akin to the "reasonable person" standard.  This theoretical person is the objective vantage point for making obviousness determinations.

125.    A patent is obvious if the opposing party demonstrates "by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *InTouch Techs., Inc. v. VGO Commc'ns, Inc*., 751 F.3d 1327, 1347 (Fed. Cir. 2014).

126.    Prior art is information known publicly before the effective filing date of a U.S. patent application.

127.    Although Defendants were aware of Norwich's position by no later than February 2020, investors were essentially left in the dark.  The following is a sample of Defendants' rosy, misleading representations – made after February 2020 – concerning the strength of the Company's patents for Xifaxan and Xifaxan's increasing financial contributions to the Company going forward:

- "Under the terms of the agreement [with Sandoz, another generic company], all intellectual property protecting XIFAXAN remains intact, and we preserved market exclusivity until 2028." (May 7, 2020)

- "As we worked through the majority of [loss of exclusivity on various drugs] now, we're seeing a lot less of that in the next 2, 3, 4 years. . . . *we won't be working through the important headwind of loss of exclusivity*." (June 10, 2020)

- *"the longevity of that XIFAXAN that will allow us to manage our way through this* and to ensure that, once again, the Bausch Health Care business . . . will also be very successful." (August 6, 2020)

- "[T]he one [loss of exclusivity] everyone thinks about in 2028 for XIFAXAN.  But if you set that aside, just looking out over the next 5 years, handful years, there's not a lot in the way of LOEs . . . ." (March 3, 2021)

128.    These repeated bullish representations plainly affected market perception, drowning out any Norwich-related risk disclosures which may have been buried in the fine print of Defendants' SEC filings.  For instance, a January 22, 2021 report by Piper Sandler analysts mentioned multiple times *as a matter of fact* that Bausch Health's exclusivity over Xifaxan would last until 2028.  Similarly, J.P. Morgan analysts wrote in March 2021 that "Xifaxan (~35% of sales & by far the largest piece

of the business) has a reasonable runway of growth with ~7 years until its first generic launch . . . ."  Similarly, Deutsche Bank analysts wrote in November 2021, "[W]e believe Xifaxan still has a long runway with the potential for additional upside.  And we further note that the impact from [loss of exclusivity] in 2021 and coming years should be much less significant than in recent years."  Evidently, the credible risks of Norwich's patent challenges were not adequately conveyed to the market.

129.    Moreover, by repeatedly speaking about the longevity of Xifaxan's patents and the intact nature of Xifaxan's intellectual property, Defendants assumed an affirmative duty to speak the whole truth regarding Xifaxan's intellectual property risks, *i.e.*, by fully disclosing the credible threat posed by Norwich's challenge to Xifaxan.  Although the *pendency* of the litigation was disclosed in the Company's Form 10-K filed with the SEC on February 19, 2020, Defendants Papa and Herendeen had no duty to provide any additional public commentary about Xifaxan's longevity and the intact nature of Xifaxan's intellectual property.  But, to the extent they did provide further commentary – and they did – that created a duty to make adequate disclosure of the credibility of Norwich's claims, and the very real risk that the Xifaxan patents could be found to be invalid, which Defendants failed to do.

**4.      The Risk Materializes: Defendants Lose Their Xifaxan Patent, Causing Bausch Health's Stock Price to Plummet**

130.    A four-day bench trial on the Xifaxan dispute was held from March 21-25, 2022.  An RBC analyst note published on May 9, 2022 gave the following commentary:

**Brief background – previous settlements suggested a low risk situation**: We have previously highlighted the bench trial in Mar-22 for gXifaxan as a key tail risk to monitor (lower risk but high impact). Although three large generic companies (Teva, Sandoz and Sun Pharma) had settled for a Jan-2028 launch of generic Xifaxan, a more recent generic participant, Norwich (Alvogen), did not settle with BHC and a bench trial was therefore scheduled in late March. . . .

**Seven of the 26 Xifaxan patents were discussed at the bench trial**: During the bench trial in March, seven of the 26 Xifaxan patents were litigated which included **two** composition of matter (polymorph patents expiring in Jun-24), **three** method-of-use patents related to the HE indications (expiring in 2029) and **two** method-of-use patents related to the IBS-D indications (expiring in 2029). . . .

**BHC is likely to prevail on 2024 polymorph patents but the 2029 method-of-use patents remain a potential coin toss**.  Based on the comments from two independent legal groups, BHC is likely to prevail on the two 2024 polymorph patents.  With respect to the 2029 patents, one of the independent groups has favored Alvogen with 60-40 odds while the other has favored BHC with the same odds.  **Based on the average of these two groups, the odds of BHC prevailing on the 2029 patents is essentially a coin toss, or 50%/50%.  As such and in our view, the earlier-than-expected launch of generic Xifaxan is no longer a tail risk**.

**Next steps to monitor**. The district court is likely to rule on the generic Xifaxan litigation in late July to mid-August timeframe prior to the expiry of the 30-month stay on Alvogen's ANDA for rifaximin. Following the judgement on Xifaxan litigation, the losing party is likely to appeal to the US Court of Appeals for the Federal Circuit in our view,

which could take 12-18 months before issuing a decision on the appeal. In any event, if some of 2029 patents were to fall, it would have significant negative financial implications for BHC, which we describe in detail in our valuation section.[10]

131.    As a result of this and other revelations in the RBC report, Bausch Health stock dropped almost 20% in a single day, closing Monday, May 9, 2022 at $12.90 per share, down from a closing price on Friday, May 6, 2022 of $16.04.

132.    On July 28, 2022, Judge Richard G. Andrews gave an oral order for the case, and on August 10, 2022, the trial Order was filed.

133.    The Court ruled in favor of Salix for the HE indication, but held that the polymorph patents and the method patents for IBS-D in adults were invalid as obvious.

134.    On this news, Bausch Health's stock price plummeted by 47%, closing July 29, 2022 at $4.62, down from a July 27, 2022 closing price of $8.68.

### 5.    A Glimmer of Hope, and More Disappointment

135.    By invalidating Salix's IBS-D patent, the court opened the door for generic competitors to manufacture and market rifaximin for IBS-D.  However, the court would not permit Norwich itself to do so, yet; just other generics.  Accordingly, the court ordered the FDA not to approve Norwich's ANDA before the latest expiration of Salix's patents in 2029.

---

[10]   All emphasis in original.

136.    Seeking to enter the market sooner, Norwich amended its ANDA and removed the indication for HE.  The amended ANDA sought approval only for IBS-D, for which Salix's patent had been found to be invalid.  Reasoning that the amended ANDA would not infringe on any Salix patent, Norwich moved the court under Rule 60(b)(5) to amend its decision and allow the FDA to approve the amended ANDA before 2029.  Norwich argued that it would be inequitable to allow other generic companies, but not Norwich itself, to benefit from Norwich's successful challenge to Salix's patents.

137.    Nonetheless, on May 17, 2023, the court denied Norwich's Rule 60(b)(5) motion.  The court explained that "what [Norwich] seeks is unprecedented in an ANDA case.  I am hesitant to be the first, because it just seems wrong to me that [Norwich] can litigate a case through trial and final judgment based on a particular ANDA, and then, after final judgment, change the ANDA to what it wishes it had started with, and win in a summary proceeding."

138.    That day, Bausch Health put out a statement representing that "[a]s a result of this decision, Norwich's ANDA cannot be approved until Oct. 2, 2029."

139.    As a result of this news and the Company's representation, Bausch Health's stock price jumped about 41% over two days, from its May 17, 2023 opening of $6.08 per share to a close on May 18, 2023 of $8.56.

140.    The market's optimism was short lived, however.  On June 2, 2023, the FDA said it could grant tentative approval to Norwich's ANDA to treat IBS-D, but, pursuant to the order of the Delaware district court, it could not grant final approval until 2029.  As explained by J.P. Morgan, the grant of tentative approval signified that "the FDA found Norwich's rifaximin tablets (550mg) to be bioequivalent and therapeutically equivalent to Salix's Xifaxan (and found Norwich's facilities to follow 'good manufacturing practices')."

141.    Three days later, Norwich sued the FDA in the United States District Court for the District of Columbia, asking the court to force the FDA to grant final approval immediately.

142.    On this news, Bausch Health's stock price dropped more than 10% over three days, closing on June 8, 2023 at $7.10, down from a closing price on June 5, 2023 of $7.94.

### D.    Post-Class Period Events

143.    On September 18, 2023, CFO Vadaketh announced that he would resign from his role at Bausch Health.

144.    On November 1, 2023, the United States District Court for the District of Columbia ruled on the Norwich case.  It held for the FDA and against Norwich. "[T]he Court is persuaded that the Delaware District Court unambiguously directed that the FDA wait until October 2, 2029 to approve" Norwich's ANDA.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS MADE DURING THE CLASS PERIOD

145.   The Class Period begins on May 7, 2020, at which time Defendants made materially false and misleading statements regarding the strength of Bausch Health's Xifaxan patents.  Discussion of these statements begins at ¶158.

**Misstatements and Omissions Pertaining to Legacy *Valeant* Liability**

146.   On May 12, 2020, at a fireside chat with an analyst from Bank of America Merrill Lynch, Papa was asked about the Company's "potential exposure of Canadian stock drop securities litigation, if any?"  In his response, he downplayed the Company's remaining exposure, giving the impression that *Valeant* liability was, for the most part, "behind us":

> So I'm not going to give a specific number. I'm going to say the majority of the stock drop suit was in the United States and we have resolved that, as you know. There are still some Canadian lawsuits and there are still things that we need to continue to work to resolve. But *we believe we've taken care of the majority of this issue with our U.S. class action settlement. There still are some opt-outs, to be clear, in the United States, there's still a Canadian situation, but we think we've taken care of the majority*. We think it was the right decision. It hurt us relative to our debt pay downs for a cost of about a year of debt pay downs, about $1.2 billion. *But we think it was the right long-term decision to get it behind us, to move forward and to continue to transform our company*.

147.   The statements referenced above in ¶146 were materially false and/or misleading because they omitted the following adverse facts which Defendants then knew or recklessly disregarded and failed to disclose:

(a)    that the Company still faced massive liability from the Opt-Out Plaintiffs, the claims of which are in excess of the Company's entire market capitalization; and

(b)    accordingly, the Company's Valeant liability was not "behind us."

148.   While the Company had previously disclosed the number of pending opt-out lawsuits (and continued to disclose them) in Forms 10-K and 10-Q, Defendants failed to accurately describe the number or size of these lawsuits in the context of their discussions regarding the spinoff.  Moreover, the risk disclosures in Defendants' Forms 10-K and 10-Q did not disclose the *magnitude* of the Opt-Out Plaintiffs' claims.

149.   On August 6, 2020, during the Company's Q2 2020 earnings call, Papa assured investors that the Company's legacy legal issues "are now behind us" and were "resolved."  In pertinent part, the conversation went as follows:

**Christopher Thomas Schott JPMorgan Chase & Co, Research Division - Senior Analyst**

Just a couple on the separation.  So I know the potential of the separation is something we've discussed in the past, but elaborate a little bit more in terms of why now in terms of the decision, like what got you comfortable to kind of move forward with this at this point? . . . .

**Joseph C. Papa Bausch Health Companies Inc. - CEO & Chairman**

Sure.  Well, I'll take the first one, the why now . . . . So Chris, great question.  Why now?  So we've been working at this for 4 years.  What we felt we had to do is we had to get ourselves into a position where we can divest the noncore assets of about $4 billion, pay down a lot of debt, about $8 billion plus of pay down, manage the portfolio that we had.  We

- 48 -

knew we were going to lose exclusivity on about $1.4 billion portfolio. We had to get through all these legacy issues that were part of what we faced as a company, the legal issues that Christina and her team solved the Salix litigation, the Allergan litigation, *the class action lawsuit, both in the United States and Canada*, the SEC, Philidor accounting. *Great news is those are now behind us*.

\*       \*       \*

### Akash Tewari Wolfe Research, LLC - Director of Equity Research & Senior Research Analyst

And kind of similar to what people have asked before, when you've talked about spinning off eye care, it always seems like the timing wasn't right given the current debt structure, what changed internally with your thinking? And was there any external shareholder pressure? And would you consider having the spinoff occur 2 to 3 years down the line and potentially also doing an equity-linked transaction to maybe lower the debt of the spinoff?

### Joseph C. Papa Bausch Health Companies Inc. - CEO & Chairman

So I think it goes back to the why now. I think there was a lot of things that we felt we need to clear -- currently resolve as we were thinking about direction of our company. We -- as I mentioned, we felt that we had a number of issues to resolve before we can make this move. We've now resolved those issues. *We resolved those legacy legal issues*. And we feel now is the time to start.

150.    The statements referenced above in ¶149 were materially false and/or

misleading for the reasons stated above in ¶147.

151.    On the same call, Executive Vice President and CFO Paul Herendeen

likewise conveyed that legacy liability was "in the rearview":

I want to reinforce something that Joe touched on is, it was -- why now? It's like it was very important that we solve and resolve many legacy issues prior to being able to kind of announce and move forward with this. And not the least among them was to resolve those -- the legacy

contingent liabilities that our colleague, Christina Ackermann, our General Counsel, and her team have done a fantastic job of settling those things out so that *we can put those in the rearview* because that enables us to think about separating into the 2 companies where both will be well positioned and *without overhangs* in order to be able to drive forward from there.

152.    The statements referenced above in ¶151 were materially false and/or misleading for the reasons stated above in ¶147.

153.    On March 9, 2021, at a Barclays Global Healthcare Conference, Papa downplayed the threat from the Opt-Out Plaintiffs, misrepresenting that there were only "a couple" of them:

### Balaji V. Prasad Barclays Bank PLC, Research Division - Director

Understood Joe.  Maybe in the interest of time, 1 question on the cash flow side.  You have $1.2 billion coming up for payment probably through the stock drop case.  And is this going to be paid pre spin?  And if it's post spin, how will the -- how will this be assigned between the -- RemainCo?

### Joseph C. Papa Bausch Health Companies Inc. - CEO & Chairman

So we've already put the -- maybe a little bit background just for everybody is that we *had* a stock drop litigation.  We settled that stock drop litigation for $1.2 billion.  We have already taken that value of that cash.  We've inserted into an escrow account, and that is awaiting the judge's final decision on the allocation of that cash to the respective parties.  But that's already been taken care of.  *That's behind us as a so-called risk.*

And *we still have a couple of opt outs that we have to work our way through*, but that particular $1.2 billion has been fully funded.  It's sitting in escrow, just awaiting the judge's final decision on allocation.  So we're in good shape with that.

154.   The statements referenced above in ¶153 were materially false and/or misleading for the reasons stated above in ¶147.

**Misstatements and Omissions Pertaining to the Bausch + Lomb Spinoff**

155.   On August 6, 2020, the Company announced plans to spin off B+L.  In a press release issued that day, Defendants claimed that the benefits of the spinoff would include "improved strategic focus and enhanced financial transparency to better enable stakeholders to value each business independently."  In pertinent part, the press release stated as follows:

> **Spinoff Would Unlock Value in the Iconic Bausch + Lomb Brand and Integrated Portfolio of Eye Health Products**
>
> **Transaction Will Enable BHC to Focus on Expanding Its Leadership in Gastroenterology, Aesthetics/Dermatology, Neurology and International Pharma**
>
> **New Segmentation Enhances Focus and Highlights Two Highly Attractive, but Dissimilar Businesses**
>
> LAVAL, Quebec, Aug. 6, 2020 - Bausch Health Companies Inc. (NYSE/TSX: BHC) ("Bausch Health" or the "Company") today announced that it intends to spin off its leading eye health business into an independent publicly traded entity ("Bausch + Lomb - NewCo") from the remainder of Bausch Health ("BHC"). The spinoff will establish two separate companies that include:
>
> - A fully integrated, pure play eye-health company built on the iconic Bausch + Lomb brand and long history of innovation; and
>
> - A diversified pharmaceutical company with leading positions in gastroenterology, aesthetics/dermatology, neurology and international pharmaceuticals.

The benefits of separating these attractive, but disparate businesses include improved strategic focus and enhanced financial transparency to better enable stakeholders to value each business independently. The timing of the anticipated spinoff will be tied to certain conditions and approvals, and the Company's completion of several important actions, including the reorganization of the reporting segments, which we expect to begin reporting in the first quarter of 2021.

"*We are committed to taking action to unlock what we see as unrecognized value in Bausch Health shares, and we believe that separating our business into two highly focused, stand-alone companies is the way to accomplish that goal*," said Joseph C. Papa, chairman and CEO of Bausch Health. "Four years ago, we initiated a multi-phase plan, first to stabilize and then to transform Bausch Health into a company positioned to deliver long-term organic growth. We have divested approximately $4 billion of non-core assets, paid down over $8 billion of debt, resolved numerous legacy legal issues and managed a loss of exclusivity on an approximately $1.4 billion product portfolio, while also investing in R&D, new product launches and core franchises with attractive growth opportunities. Our Board of Directors and management team have been working on alternatives over the last 12 months to determine how to best unlock value across our businesses, and we believe that the time is right to begin the separation process, so each business has greater flexibility to pursue strategic opportunities in their respective markets."

156.   The statements referenced above in ¶155 were materially false and/or misleading because they omitted that Defendants then knew and failed to disclose or recklessly disregarded that the real purpose for conducting the spinoff was to defraud the Opt-Out Plaintiffs, as detailed herein.

157.   The statements referenced above in ¶155 regarding the spinoff were also materially false and misleading when made because by speaking about the reasons for the spinoff, Defendants assumed an affirmative duty to disclose the central reason for

the spinoff, *i.e.*, to limit assets from which the Opt-Out Plaintiffs could collect a potential judgment or settlement.

**Misstatements and Omissions Pertaining to the Xifaxan Patent Litigation**

158.    On May 7, 2020, Defendant Papa stated on the Company's Q1 2020 earnings call as follows:

> On the right, we have called out some notable key developments. First, after we settled with Teva early in 2018, earlier this week, we resolved the outstanding XIFAXAN IP litigation with Sandoz. Under the terms of the agreement, ***all intellectual property protecting XIFAXAN remains intact, and we preserved market exclusivity until 2028***.

159.    The statements referenced above in ¶158 were materially false and/or misleading because by making statements about the intact nature of Xifaxan's intellectual property and the preservation of Xifaxan's market exclusivity, that imposed a duty on Defendants to make adequate disclosure – which Defendants did not do – of the credibility of Norwich's claims regarding Xifaxan's intellectual property, and the very real risk – known to Defendants or recklessly disregarded by them – that the Xifaxan patents could be found to be invalid because: (i) Xifaxan's patents were based on "obvious" research and thus were vulnerable to a ruling of invalidity; and (ii) in February 2020, Norwich sent Salix a letter conveying Norwich's position that Salix's patents were invalid, and stating the factual and legal bases for that position.

160.   On June 10, 2020, Papa spoke at a Goldman Sachs Global Healthcare Conference, and stated that the Company had "worked through the majority" of lost exclusivity and thus "won't have that headwind against us" "in the next 2, 3, 4 years":

> [T]hrough the first 4 years, that at least, I've had a chance to be a part of Bausch Health, we've worked through approximately $1.2 billion, I believe, $1.3 billion of product that lost exclusivity. ***As we worked through the majority of that now, we're seeing a lot less of that in the next 2, 3, 4 years. Therefore, we won't have that headwind against us that we had the last 2 to 3 years.*** So I think that's going to be an important part of driving the margin structure that we have across our total business because ***we won't be working through the important headwind of loss of exclusivity.***

161.   The statements referenced above in ¶160 were materially false and/or misleading for the reasons stated above in ¶159.

162.   On August 6, 2020, at its Q2 2020 earnings call, the Company announced plans to spin off B+L.  An analyst, noting that "the eye care business has always been perceived as durable over a long-term period," asked whether B+L would "shoulder more of the debt than the remaining pharmaceutical business which does have some durability question marks[.]"  (Ironically, Defendants did the exact opposite.)  Papa did not directly answer the question of allocation of debt and respective capital structures.  He did, however, intimate that Bausch Health was more durable than the questioner seemed to suppose, due in large part to the "longevity" of the Xifaxan patent:

**David A. Amsellem Piper Sandler & Co., Research Division - MD & Senior Research Analyst**

So I know that you haven't provided specifics on the capital structure. But I do think that at least some qualitative commentary on the capital structure would be helpful as we navigate this period. I guess my question here is, given that the eye care business has always been perceived as durable over a long-term period, doesn't have like major exposures to losses of exclusivity.

Is it fair to say that that's going to be a business -- that business is going to shoulder more of the debt than the remaining pharmaceutical business which does have some durability question marks, albeit nothing as dire as what we saw the last few years? I guess just from a sort of white space perspective, can you just help us in terms of how you're thinking about it? And again, I know these are early days, but I think it would be helpful to at least address it in some way.

**Joseph C. Papa Bausch Health Companies Inc. - CEO & Chairman**

*    *    *

Do we absolutely recognize capital structure is an important question? The answer yes. We're going to deal with that in a very efficient manner.

But the only thing I will point out, David, I know you follow very closely, is that we do feel very good about the progress we've also made on the loss of exclusivity products. We've worked our way through that. The majority of those are behind us. And now we feel we've done a very good job in managing the XIFAXAN challenges to the patent. You probably recall that we've settled both with Teva, the world's largest generic company and arguably the third largest company is Sandoz in terms of a 2028 date. So we do think we've got that – ***the longevity of that XIFAXAN that will allow us to manage our way through this*** and to ensure that, once again, the Bausch Health Care business with a focus on international pharma, gastroenterology, aesthetics, dermatology, neurology will also be very successful. So I probably don't want to make any more specific comments about how we allocate debt, et cetera. But I do think we'll manage that in a way that is best for both businesses to optimize.

163.   The statements referenced above in ¶162 were materially false and/or misleading for the reasons stated above in ¶159.

164.   On March 3, 2021, at a JPMorgan Global High Yield & Leveraged Finance Conference, Herendeen again stated that loss of exclusivity ("LOE") would not be a major issue for the Company until the 2028 Xifaxan expiry, stating in pertinent part, as follows:

> **Paul S. Herendeen Bausch Health Companies Inc. - Executive VP & CFO**
>
> Sorry, I don't want to get off the topic without covering didn't -- set aside, of course, the one everyone thinks about in 2028 for XIFAXAN. But if you set that aside, ***just looking out over the next 5 years, handful years, there's not a lot in the way of LOEs that are going to be anything other than an MD&A item as opposed to the really massive headwinds that we've seen for the past, well, 5 years now.***
>
> \*      \*      \*
>
> ***[Y]ou're looking at RemCo having just one asset that will date certain, lose exclusivity at the beginning of 2028***.

165.   The statements referenced above in ¶164 were materially false and/or misleading for the reasons stated above in ¶159.

166.   On May 17, 2023, the United States District Court for the District of Delaware denied Norwich's Rule 60(b)(5) motion (discussed above ¶¶135-139). That day, Bausch Health issued a press release representing that "[a]s a result of this decision, Norwich's ANDA cannot be approved until Oct. 2, 2029."

167.    The statement referenced above in ¶166 was materially false and/or misleading because it omitted the following adverse facts which Defendants then knew or recklessly disregarded:

(a)    that the court's denial of the Rule 60(b)(5) motion would not preclude the FDA from granting *tentative* approval; and

(b)    that Norwich could still seek final approval by appealing to the Federal Circuit (which it did two days later on May 19, 2023),[11] or by suing the FDA (which it did a few weeks later, on or about June 5, 2023).

## NO SAFE HARBOR

168.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded

---

[11]    On or about August 16, 2022, Bausch Health and its subsidiary Salix appealed the Delaware district court's order invalidating Salix's patents. The docket number for that appeal in the United States Court of Appeals for the Federal Circuit is 22-2153. Norwich did not appeal at the time. Then, in light of Norwich's Rule 60(b) motion to amend, both parties agreed to abate the appeal. *See id.* ECF No. 12. The circuit court granted the abeyance on October 14, 2022, deactivating the appeal until after the district court's disposition of the Rule 60(b) motion. *Id.* ECF No. 15. The district court denied that motion on May 17, 2023, and on May 19, 2023, Norwich appealed. The docket number for that appeal in the United States Court of Appeals for the Federal Circuit is 23-1952. The Norwich appeal was then consolidated under the Salix appeal docket (22-2153) and designated as a cross-appeal. On April 11, 2024, the Court of Appeals affirmed the district court's order in full, holding Salix's IBS-D patent invalid but at the same time forbidding Norwich from entering the market before 2029. *Id.* ECF No. 71. After that, both parties moved the Court of Appeals for panel re-hearing and/or rehearing en-banc. *Id.* ECF Nos. 73-74. Both were denied. *Id.* ECF No. 76. The parties then petitioned the United States Supreme Court for a writ of certiorari, which was also denied. *Id.* ECF Nos. 78-81.

in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the company making the statement who knew that those statements were false or misleading when made.

## ADDITIONAL SCIENTER ALLEGATIONS

169.  As alleged herein, Defendants acted with scienter in that Defendants Bausch Health, Papa and Herendeen knew, or recklessly disregarded, that the public documents and statements they issued or disseminated in the name of the Company or in their own name during the Class Period were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; did not honestly believe the truthfulness or completeness of their statements; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal

securities laws. Defendants Bausch Health, Papa and Herendeen, by virtue of their receipt of information reflecting the true facts regarding Bausch Health, their control over, and/or receipt and/or modification of Bausch Health's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Bausch Health, were active and culpable participants in the fraudulent scheme alleged herein.

170. Defendants Bausch Health, Papa and Herendeen knew or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

171. The Individual Defendants, by virtue of their high-level positions with the Company – Papa as CEO and Herendeen as CFO – directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, subsidiaries, financial statements, and financial condition, as alleged herein.

172. The Individual Defendants, because of their positions with Bausch Health – Papa as CEO and Herendeen as CFO – controlled the content of the Company's

public statements during the Class Period.  Defendants Papa and Herendeen were provided with or had access to the statements alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations that were being made were false and misleading.  As a result, each of the Individual Defendants is responsible for the accuracy of Bausch Health's corporate statements and is therefore responsible and liable for the misrepresentations contained therein.

173.   At the very least, when making their public statements, the Individual Defendants were required to have a legitimate and valid basis for their representations. To the extent they were lacking such a basis, especially when presenting themselves as informed and knowledgeable, they are likewise responsible and liable for the misrepresentations contained therein.

174.   As executive officers of Bausch Health , Papa and Herendeen knew or should have been aware of key facts related to the Company's operations, including pending litigation for billions of dollars in claimed losses, the legitimacy of its patents, and the viability of – and reason for – the spinoff of its most prestigious subsidiary.

175.    Indeed, as alleged herein, Defendants knowingly transferred Bausch Health's valuable assets to B+L to eliminate them as a source of recovery for the Opt-Out Plaintiffs. This allegation is supported by, among other things: (i) the (inexplicable) giving away of B+L as part of bringing Bausch Health's leverage ratios to healthy levels; (ii) the disproportionate leveraging of Bausch Health and imposing relatively little debt on B+L, even though B+L was more capable of shouldering debt than Bausch Health; (iii) the retention by Bausch Health of the legacy Valeant liability; (iv) the execution of the B+L IPO at the worst possible time, with a smaller percentage of B+L sold than Defendants initially led the market to expect; and (v) the finding by the Chancery Division of the New Jersey Superior Court, Somerset County, that the Fraudulent-Conveyance Plaintiffs adequately pled actual intent to defraud, with their claims moving forward in discovery.  Thus, Defendants' statements regarding the reasons for the spinoff – and the expected leverage ratios for B+L and Bausch Health – were materially false and misleading and made with scienter.

176.    Defendants' statements downplaying their exposure from the Opt-Out Plaintiffs were likewise made with scienter, as Bausch Health has known about this exposure since early 2020.  For example, the Fraudulent Conveyance Plaintiffs claim that in early 2020, in connection with the settlement of the class action and/or document discovery in the opt-outs' direct actions, Bausch Health was provided access to trading data that verified that the plaintiffs to the direct actions had

collectively suffered $4.2 billion in damages (plus billions more in pre-judgment interest). No doubt over the course of the lengthy and contentious Valeant saga, this and many other such interactions occurred.

177. There is little question that Papa and Herendeen were aware of that claim. As detailed above, their overarching focus was getting the Company back on track in the wake of the Valeant fiasco. They were acutely attuned to the Company's remaining debts, liabilities, and legacy legal exposure, discussing these topics constantly. *See, e.g.*, *supra* ¶42 (Papa discussing steps that he and the rest of the executive team had taken and would take to manage their legacy debt load); ¶¶36, 53 (Herendeen discussing leverage ratios).

178. Moreover, the sheer magnitude of the Opt-Out Plaintiffs' claim is suggestive that the Individual Defendants would have paid attention to it. By 2022, the mere *settlement* value of the direct actions was estimated by *Bloomberg Intelligence* at a staggering $500-$800 million – suggesting actual damages many times higher. It would be absurd to suggest that, just two years earlier, Defendants thought those actions were immaterial.

179. This is especially true given how involved and multifaceted the *Valeant* litigation was. As of the end of 2019, there were about 500 entries on the lead docket[12]; and, on separate dockets, there were 33 direct actions against the Company,

---

[12] *Potter v. Valeant Pharms. Int'l, Inc. Litig.*, Case No. 3:15-cv-07658 (D.N.J.).

each involving numerous institutional plaintiffs (trusts, investment funds, pension funds, partnerships, companies, foundations, and so on). Some of those direct actions were filed in 2016, some in 2017, some in 2018, and some in 2019 (and a few more were filed in 2020).

180.    As just one example, the Fraudulent Conveyance Plaintiffs claim that, in early 2020, in connection with the settlement of the class action and/or document discovery in the opt-outs' direct actions, Bausch Health was provided access to trading data that verified that the plaintiffs to the direct actions had collectively suffered $4.2 billion in damages (plus billions more in pre-judgment interest).[13] No doubt over the course of the lengthy and contentious *Valeant* saga, this and many other such interactions occurred.

181.    Moreover, by Papa and Herendeen speaking authoritatively in prepared remarks and in response to questioning, and presenting themselves as knowledgeable about the extent of Bausch Health's legal exposure from Valeant-related litigation, it is reasonable to infer that Papa and Herendeen were, in fact, informed and knowledgeable about the true extent of such exposure.

182.    In short, Defendants knew in 2020 that Bausch Health's liability from the claims of the Opt-Out Plaintiffs was massive. Thus, their statements downplaying

---

[13]    *See GMO Trust* AC ¶92.

their exposure to the Opt-Out Plaintiff's claims were materially false and misleading and made with scienter.

183.   Finally, Defendants' statements regarding the strength of its patents for Xifaxan were knowingly or recklessly false and misleading and made with scienter. Aside from having access to information/and or knowing themselves that certain of the patents for Xifaxan were "obvious" and thus were at serious risk of surviving a challenge to exclusivity, Defendants had been informed by Norwich of this "obvious" claim by no later than February 2020.   Nonetheless, after that time, Defendants continued to make positive statements about the strength of the Company's Xifaxan patents knowing or recklessly disregarding that certain of those patents were "obvious" and there was a very real risk that they could be found to be invalid, which is ultimately what happened.

184.   The Individual Defendants were all seasoned corporate executives. Before joining Valeant, defendant Papa was chairman and CEO of Perrigo, an American manufacturer of private label over-the-counter pharmaceuticals, for about ten years, and before that he was chairman and CEO of the pharmaceutical and technologies services company Cardinal Health.  Defendant Herendeen became CFO in 2016 after more than 30 years of broad financial experience and leadership, including 16 years as CFO of Warner Chilcott and MedPointe.

185.   Scienter is further supported by the fact that the Company's press releases and SEC filings, and the Individual Defendants' statements and responses to questions on conference calls, all contained detailed, specific information about the subject matters of the alleged frauds, including the B+L spinoff, legacy Valeant liability, and the viability of Xifaxan's intellectual property.  In drafting, reviewing or commenting on press releases and SEC filings, and preparing for conference calls and investor presentations -and making the specific representations that they made - the Individual Defendants either knew, or recklessly disregarded the facts underlying these matters.

186.   Additionally, as set forth in detail herein, the frauds alleged relate to the core business and operations of Bausch Health.  Specifically, B+L is Bausch Health's largest subsidiary by revenue, and Xifaxan is Bausch Health's largest single product by revenue.  These, as well as the Opt-Out Plaintiffs' ongoing litigation, were a constant topic of conversation by Defendants and analysts throughout the Class Period.  The Company's Net Leverage is likewise a key financial metric which was carefully monitored by Defendants.  And the B+L spinoff is a watershed event in the evolution of the Company, as evidenced by the immense analyst focus on the topic. Accordingly, knowledge of the frauds may be imputed to Defendants.

187.   Scienter is also supported by the high level of executive turnover the Company experienced during the Class Period.  On March 11, 2021, the Company

announced that, effective June 1, 2021, CFO Herendeen would transition to the newly created role of Advisor to the chairman and CEO, and Sam Eldessouky would take Herendeen's place as CFO. Analysts at Bank of America looked askance at the "peculiar" timing:

> Per BHC, the CFO succession was unsurprising as he was nearing average retirement age (64) and well beyond initial tenure commitment (to 2018). To us, the update comes as a bit of a surprise given BHC is in the middle of a major separation and the CFO's recent comments on a Dec. call suggested a desire to remain in a managerial capacity with RemainCo. Shareholder activist recently went public with critiques of mgmt's approach to the B&L spin, advocating for a faster timeline to B&L spin.

188. On May 4, 2021, Defendants announced that Bausch Health's current CEO and soon-to-be CFO, Papa and Eldessouky, would be leaving to join asset-rich B+L – even though their replacements at Bausch Health had not yet been chosen, and even though Eldessouky had not yet even started his tenure as CFO of Bausch Health.

189. On May 6, 2022, Defendants announced in a press release that Papa, Bausch Health's CEO and Chairman, would be stepping down as Bausch Health's CEO to become CEO and Chairman of B+L, as previously announced. The press release further represented that "Mr. Papa will remain in the role of chairman of the Board of Directors for Bausch Health until the full separation of Bausch + Lomb[.]" In fact, just a month and a half later - June 23, 2022 - Papa stepped down from the Bausch Health board, effective immediately. And then the next month, on July 20,

2022, Papa also stepped down from the board of B+L effective immediately, and announced he would step down as CEO of B+L after finding a replacement.

190.   CFO Eldessouky left for B+L together with Papa, and was replaced by Tom Vadaketh.   Vadaketh stepped down just over a year later, on or about October 13, 2023.   Interim CFO John Barresi covered for the next ten months, until Jean-Jacques Charhon assumed the role full-time on or about August 19, 2024.   Thus, in the span of four years, the Company has had five CFOs: Herendeen, Eldessouky, Vadaketh, Barresi, and Charhon.

191.   This unusually high turnover further suggests that the Individual Defendants knew that Bausch Health was a metaphorical sinking ship.

192.   Defendants were also motivated to engage in the fraud detailed herein to enable them to raise capital for the Company through the issuance or refinancing of billions of dollars of bonds.

193.   Indeed, throughout the Class Period, Bausch Health issued and/or refinanced more than $9 billion of bonds.   These transactions were of virtually existential importance to Bausch Health, because they enabled the Company to push off multibillion-dollar repayments of principal.

194.   Such issuances/refinancing agreements included, but are not necessarily limited to, the following:

(a)    On May 11, 2020, the Company announced an offering of $1.25 billion aggregate principal amount of new senior notes due 2029, the proceeds of which would be used to fund the conditional redemption of existing 6.50% Senior Secured Notes due 2022.

(b)    On November 18, 2020, the Company announced an offering of a combined $1.75 billion aggregate principal amount of new senior notes due 2029, the proceeds to be used to fund the conditional redemption of outstanding $1.5 billion aggregate principal amount of 4.50% Senior Notes due 2023.

(c)    On May 24, 2021, the Company announced an offering of $1.6 billion aggregate principal amount of new senior secured notes due 2028, to fund the repurchase of $1.6 billion aggregate principal amount of existing 7.00% Senior Secured Notes due 2024.

(d)    On January 27, 2022, the Company announced an offering of $1.0 billion aggregate principal amount of new senior secured notes due 2027.  It also announced that it was seeking to refinance its existing credit agreement, the refinanced credit agreement to consist of approximately $2.5 billion of term B loans and a $975 million revolving credit facility.

(e)    On August 30, 2022, the Company announced exchange offers and consent solicitations for certain existing senior notes.  Under this arrangement, the Company would issue up to $4 billion of new secured debt in exchange for

outstanding unsecured debt.  The debt would be exchanged at a discount of 44 to 77 cents on the dollar (which S&P reportedly considered "tantamount to a default").  RBC expected the holders of $6.9 billion of current outstanding principal to accept the deal, which would result in net debt reduction of $2.9 billion.

195.   Obviously, like all creditors, the investors who bought these new bonds would want to know (or rather, believe) that the entity to which they were lending their money was creditworthy and solvent.  Defendants therefore had a unique, powerful and specific incentive to conceal the problems facing the Company in order to sell these bonds.

## LOSS CAUSATION

196.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Bausch Health stock and operated as a fraud or deceit on purchasers of Bausch Health stock during the Class Period by failing to disclose and misrepresenting the adverse facts detailed herein.   As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Bausch Health stock declined significantly as the prior artificial inflation came out of the Company's stock.

197.   As a result of their purchases of Bausch Health stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages,

under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused shares of Bausch Health stock to trade at artificially inflated levels throughout the Class Period, reaching higher than $34 per share in March 2021.

198.    When the truth about the Company was revealed to the market, the price of Bausch Health stock fell significantly.  These declines removed the inflation from the price of Bausch Health stock, causing real economic loss to investors who had purchased Bausch Health stock during the Class Period.

**May 4, 2021**

199.    On May 4, 2021, Defendants "surprised investors[,]" in the words of J.P. Morgan, by announcing that Bausch Health would be heavily leveraged following the spinoff.  Papa stated on a conference call that day as follows:

> [R]egarding the question of debt leverage, ***we formally articulated the 5.5x leverage target for Bausch Health and the roughly 4x for Bausch & Lomb***, that was one path of many.  We anticipate Bausch Pharma to be a very strong cash generator as we expect it to enjoy an attractive tax rate and has modest annual capital expenditure requirements.  As such, it will convert a great deal of its earnings to cash, and carry a fair degree of leverage.  With a commitment to prioritize the use of free cash flow to reduce debt and show rapid improvement in leverage, ***we are confident that Bausch Health will be able to handle 6.5 to 6.7x net leverage***.  On the B&L side of the equation, we want B&L to start with leverage more consistent with its most relevant comparable peer companies as this will enable the market to value B&L without the need to consider significant differences in capital structure.

200.   Analysts were surprised by this change of plans.  Piper Sandler, for instance, wrote that "we struggle with the exceedingly high leverage ratios for the pharma business that, in our view, are a recipe for a depressed valuation[.]"  (Piper Sandler reiterated this on May 20, 2021, predicting that Bausch Health "looks poised for a depressed valuation" because of, *inter alia*, "the reality that this business will be saddled with high debt levels[.]")  RBC noted on May 5, 2021 that "with higher leverage there would likely be greater concern associated with RemainCo (particularly among debtholders) and the shares could be more volatile post-spin given the amount of debt relative to estimated enterprise value."  Bank of America likewise expressed concern over Bausch Health's "disproportionate[]" leverage:

> In our view, mgmt's update that RemainCo will carry 6.5-6.7x net debt to EBITDA disproportionately levers pharma vs. peers.  While leverage is in-line on a trailing/current year basis, the issue is the Xifaxan LOE in 2028, or an est. ~50% of RemainCo EBITDA.  In our view, there is a risk RemainCo trades at a cliff-multiple unless the market is willing to assign significant value to BHC's pharma pipeline, which we view as speculative (limited supportive clinical data).  Based on our checks – a key consideration for separation is capitalizing RemainCo at a level that the markets can assign meaningful equity value (relative to debt), on par with peers; we est. RemainCo would need to trade >7.5x multiple vs. our assumed 6.4x to trade at comparable debt-to-equity.

201.   The change impacted Bausch Health's credit profile, as well.  Moody's Investors Service called the revised capital structure target "credit negative[.]"  The Moody's publication also commented that "***[p]reviously, Moody's envisioned that a***

*spinoff represented a more substantial deleveraging opportunity for the remaining business*."

202.    According to a J.P. Morgan report, S&P revised its outlook to negative, saying "'the negative outlook reflects the possibility of a one-notch downgrade given that [RemainCo] will likely stay above 5x for at least two years post spin, as well as an uncertain financial policy under the new management team.'"

203.    In response to this revelation, shares declined about 11% in a single day, closing on May 4, 2021 at $27.94, down from a closing price of $31.42 the day before.  Analysts attributed this stock drop to the updated capital structure targets. Barclays wrote that "the revised leverage goals around BHC Pharma likely drove the 10%+ stock decline . . . ."

**April 28, 2022**

204.    On April 28, 2022, the Company filed an amended S-1 announcing a tentative price band of $21-24 for the upcoming B+L IPO.  This was lower than had been expected, and analysts at RBC noted that it would likely result in less deleveraging (debt reduction) for Bausch Health.

205.    On this news, Bausch Health stock slumped more than 7% over two days, closing April 29, 2022 at $19.01 per share, down from a closing price on April 27, 2022 of $20.56.  Commentators attributed the Bausch Health stock drop to the unexpectedly low pricing of the B+L IPO.

206.    An RBC analyst report released May 5, 2022 pointed to "today's poor market conditions, an overhang associated with the expected follow-on after the 125-day lock-up and other concerns noted recently, including *uncertainty related to the gXifaxan litigation and the lawsuit alleging fraudulent transfer of assets from BHC [Bausch Health] to B+L*."  Thus, the low pricing of the B+L IPO – which caused Bausch Health share value to decline – was due, at least in part, to the materialization/revelation of problems that Defendants had fraudulently concealed.  Specifically, this was a materialization and/or revelation of the risks that Defendants concealed when they downplayed their exposure from the Opt-Out Plaintiffs (*supra* ¶¶146-154) and from Norwich's challenge to the Xifaxan patent (*supra* ¶¶158-167).

**May 5, 2022**

207.    On May 5, 2022, at about 1:03 p.m., *The Wall Street Journal* published reports that the B+L IPO was expected to price at the low end or below the targeted range (*i.e.*, $21 or less).  This tip was attributed to "bankers on the deal . . . according to people familiar with the matter."  On this news, Bausch Health stock dropped suddenly, losing about 3% in value in less than an hour.  The stock closed at $16.76 per share, a decline of about 8% from the day's opening.

**May 9, 2022**

208.    On May 9, 2022, RBC published an analyst note lowering the price target for Bausch Health from $32 per share to $21.  The note discusses a number of reasons

for the lowered price target, including, *inter alia*, lower IPO proceeds and generic Xifaxan risks. This note was widely discussed by the media (*Dow Jones*, *Bloomberg*, etc.).

209. RBC's new price target included, for the first time, a bifurcated valuation: "Given the uncertainty related to the gXifaxan litigation, our [sum-of-the-parts valuation] for BHC is now based on the average price under two different scenarios: the genericization of Xifaxan in 2026 (new) and 2028 (original)." RBC valued Bausch Health at $24 per share if it would win the patent litigation and $18 per share if it would lose; the price target of $21 represented the average of these two eventualities. The RBC report elaborated as follows:

> **gXifaxan litigation risk - from low probability to an unattractive 50/50 potential outcome on 2029 [method of use] patents.**[14] In our view, one of the key factors that has contributed to the recent weakness in BHC shares is the deterioration in risk profile of BHC associated with the gXifaxan patent litigation. ***We believe the market's original view was one of tail risk but that has changed to an unattractive binary ~50/50 potential outcome on the 2029 MOU patents, according to experts.***[15]
>
> *        *        *
>
> One of the key factors that has contributed to the recent weakness in BHC shares is the deterioration in risk profile of BHC associated with the gXifaxan patent litigation with Norwich/Alvogen. We believe the market's original view on the situation was one of tail risk, suggesting

---

[14] Emphasis in original.

[15] Emphasis added.

low risk but high impact in the case of a negative outcome for BHC. Post the trial, however, independent legal groups have noted material risk based on their view of the trial. **In particular, certain method-of-use patents set to expire in 2029 now have a 50/50 outcome on which company prevails. This could lead to a Xifaxan generic entering the market between 2025 and 2027 if Norwich were to win versus the previously accepted 2028 thinking**.[16]

210.    The report also identified several other items as having "important implications" for RBC's sum-of-the-parts valuation.  One item on the list was the fraudulent conveyance action against the Company, which had been filed on March 24, 2022.  The analysts noted that this lawsuit "contributes to complexity":

> The latest amended B+L S1 also notes this as a new risk with respect to the split and the distribution of the remaining BLCO shares to BHC shareholders.
>
> **Related implications arising from the gXifaxan litigation**: . . . [I]f BHC loses the gXifaxan litigation, the fraudulent conveyance case may become even stronger as BHC's ability to pay could be impaired as cash flows decline during the earlier generic period.  In the worst-case scenario, BHC may decide not to distribute its entire stake in BLCO shares, although BHC management has expressed its full intention to do so.  The earlier-than-expected launch of gXifaxan may also make it more expensive for BHC to refinance its outstanding debt in the future . . . .[17]

211.    In response to RBC's commentary and reduced price target, Bausch Health stock dropped almost 20% in a single day, closing Monday, May 9, 2022 at $12.90 per share, down from a closing price on Friday, May 6, 2022 of $16.04.

---

[16]  Emphasis in original.

[17]  All emphasis in original.

212.   RBC's commentary and reduced price target – which caused Bausch Health share value to decline – was a materialization and/or revelation of problems that Defendants had fraudulently concealed.  Specifically, this was a materialization and/or revelation of the risks that Defendants concealed when they downplayed their exposure from the Opt-Out Plaintiffs (*supra* ¶¶146-154) and from Norwich's challenge to the Xifaxan patent (*supra* ¶¶158-167).

**July 28, 2022**

213.   On July 28, 2022, the U.S. District Court for the District of Delaware issued an oral order in the Norwich litigation, finding certain Xifaxan patents invalid. As discussed above, the Court found the polymorph patents and the method patent for IBS-D in adults to be invalid as obvious.

214.   RBC analysts' "sentiment" in response to this ruling was "**negative**," with the word "negative" in bold red letters.  The RBC report elaborated as follows:

> *We view the apparent district court ruling on Xifaxan litigation as potentially the worst possible outcome for BHC*, where the judge ruled invalidity on both the 2029 MOU patents for IBS-D and also on the 2024 beta polymorph although the HE patents (associated with the smaller market) remained valid, as per Bloomberg and Street Account. . . . In a scenario where Norwich potentially changes the label (to exclude the HE indication), the stipulation agreement will likely become inapplicable and patent controversy may re-emerge impacting the timelines of a generic Xifaxan launch, in our view.

215.   J.P. Morgan analysts downgraded BHC shares (from "overweight" to "neutral") and opined:

If the court rules as the oral order is suggesting, it would represent a ***near-worst-case scenario for BHC and likely enable generic competition for Xifaxan in the late 2024-2025 time frame*** (we would expect BHC to appeal the ruling and the subsequent legal proceedings to extend into early-mid 2024).  From a revenue perspective, Xifaxan generates ~$1.7bn in revenues today (and ~$1.1bn of FCF).  While we would expect BHC to retain ~20-25% of the Xifaxan business in the first few years of competition, we estimate that lost FCF could amount to $2.5-3bn in the late 2024-2027 time frame (our estimates currently assume Xifaxan LOE in 2028).

Following these news, we struggle to see how the company will be able to proceed with the planned separation of BLCO given the significant leverage problems the patent loss creates on the pharma business.  And while there is still hope that BHC could win on appeal, knowing what we know today, the risks to the downside (Norwich getting an approved product sooner-than-expected, compounding legal issues with creditors due to the separation) appear to outweigh the risks to the upside.

216.    Piper Sandler released a report with the headline "Lower Court Drops The Hammer On Xifaxan; Continue to Stay Away From The Shares," emphasizing its hesitation to recommend a buy rating on Bausch Health stock.  The report explained, "the heightened risk surrounding the exclusivity runway for Xifaxan now makes it all the more difficult to construct a cogent bull case on BHC shares."

217.    Analysts and investors were also concerned about the impact this ruling would have on the much anticipated B+L spinoff.  Bank of America explained:

On the surface the ruling poses risk of a more expedited generic threat if Norwich can secure approval of a beta form generic and is willing to launch at risk of an appeal.  It's our sense, ***the bigger market concern is the implications of today's ruling to BHC's ability to spin off its Bausch & Lomb eye health unit. Xifaxan is Bausch's largest and most profitable drug that had an assumed LOE in 2028 per settlement agreements with several generic suppliers***.

218.    Bausch Health's stock cratered on this news, closing July 29, 2022 at $4.62, down from a July 27, 2022 closing price of $8.68 – a decline of 47%. *Bloomberg* and *Market Watch* commented that this was the lowest close for Bausch Health stock since 1995.

**April 3, 2023**

219.    On April 3, 2023, the New Jersey state court denied Defendants' motion to dismiss the fraudulent conveyance action.  The following day, J.P. Morgan released an analyst report discussing the court's decision:

> This is an important contingent liability that could affect the outcome of the final solvency opinion and whether the spin moves forward.  That said, it's still too early, this decision just adds another complexity to the various game theories, and it may have prolonged the timing to a final decision or settlement.  Regardless, considering the numerous regulatory, legal and financial tests needed to affect the spin, it's difficult to assume the spin can be completed this year.

> Given the risks in valuing uncertainties in the current environment, we believe yesterday's move in levels post the Superior Court decision is short term (***but justified***).

220.    *The Wall Street Journal* reported on the ruling in an article titled "Bausch Health Creditor Lawsuit to Proceed, Jeopardizing Eye-Care Spinoff," published around midday on April 6, 2023.  The article noted that "Bausch Health's stock fell more than 6% from Monday's open to close at $7.55 per share Tuesday, the day after Judge Goodzeit released her ruling."   The stock continued to slide after that

publication, closing on April 6 at $7.33 per share, or about 9% lower than it opened on April 3.

221.   This was a materialization and/or revelation of the risk that Defendants concealed when they downplayed their exposure from the Opt-Out Plaintiffs.  The market only now realized that the Opt-Out Plaintiffs were, in fact, a force to be reckoned with – contrary to Defendants' nonchalant, dismissive statements (*supra* ¶¶146-154).

**May 4, 2023**

222.   On May 4, 2023, the Company announced its first-quarter 2023 financial results.  Revenue was in-line with expectations, but EBITDA fell short.  The difference was due to increased expenses as compared to the same quarter in the prior year, as shown in the Company's earnings presentation:

Consolidated
# 1Q23 Non-GAAP[1] Financial Results
Amounts in millions USD

| | Three Months Ended | | Favorable (Unfavorable) | |
|---|---|---|---|---|
| | 3.31.23 | 3.31.22 | Reported | Constant Currency[1] |
| Revenues | $1,944 | $1,918 | 1% | 3% |
| Adj. Gross Profit[1] | $1,362 | $1,367 | 0% | 1% |
| *Adj. Gross Margin[1]* | *70.1%* | *71.3%* | *(120 bps)* | |
| Selling, A&P (same as reported) | $479 | $435 | (10%) | (12%) |
| Adj. G&A[1] | $212 | $143 | (48%) | (49%) |
| R&D (same as reported) | $143 | $127 | (13%) | (13%) |
| Total Adj. Operating Expense[1] | $834 | $705 | (18%) | (20%) |
| Adj. EBITA[1] | $528 | $662 | (20%) | (19%) |
| Adj. EBITDA Attributable to Bausch Health Companies Inc.[1] | $588 | $732 | (20%) | (17%) |
| Adj. Net Income Attributable to Bausch Health Companies Inc.[1] | $191 | $263 | (27%) | |
| *Diluted Shares Outstanding[2]* | *366.8M* | *364.8M* | | |
| Adj. Cash Flows from Operations[1,3] | $70 | $325 | (78%) | |

1. This is a non-GAAP measure or non-GAAP ratio. See Slide 3 and Non-GAAP Appendix for further information on non-GAAP measures and ratios.
2. This figure includes the dilutive impact of options and restricted stock units of approximately 3,426,000 and 3,600,000 common shares for the three months ended March 31, 2023 and 2022, respectively, which are excluded when calculating GAAP diluted loss per share because the effect of including the impact in this calculation would have been anti-dilutive.
3. Excludes legacy legal settlements (net of insurance recoveries), separation payments, separation-related payments, IPO payments and IPO-related payments, business transformation costs, and interest payments charged against premium.

BAUSCH Health

223.    As this table shows, 1Q23 selling, advertising, and promotional expenses were 10% higher than 1Q22; research and development expenses were 13% higher; and general and administrative expenses were **48%** higher.

224.    On the Q1 2023 earnings call, CFO Vadaketh explained that **"[t]he increase in consolidated adjusted G&A costs reflects the impact of the separation and the costs to stand up 2 public companies**."

225.    In addition to the disappointing EBITDA, a number of analysts expressed dissatisfaction over Defendants' caginess with respect to the B+L spin.  An analyst for Evercore ISI wrote:

> Let me start with what you won't find in press release:
>
> - Any mention of spin (outside of fwd looking statements)
>
> - Where they're at in terms of regulatory approvals or solvency opinion
>
> - Whether recent NJ court ruling impacts how they're thinking about spin (the court basically didn't rule against Bausch on voiding based on fraudulent conveyance because the actual spin had not happened)

226.    Indeed, Bank of America lowered its price target for Bausch Health on account of these "uncertainties" and lack of "clarity":

> 1Q: EBITDA miss; no added clarity on path to B+L spin and resolution of legal matters
>
> *    *    *
>
> Lower [price objective] to $6 on lower EBITDA, spin uncertainties
>
> Bausch Health's (BHC) 1Q update included roughly in-line revenue (-1%) but EBITDA came in 19% below consensus. While BHC reaffirmed its commitment to the proposed Bausch + Lomb (B+L) spin, **BHC did**

*not offer any added clarity on timeline and/or path to spin* (eg implications from outstanding litigation matters). After factoring in the EBITDA miss *and limited clarity on gating items to B+L spin*, we lower our [price objective] from $9 to $6 which reflects: 1) redistribution of valuation mix between SOTP and blended company multiple from 65%/35% to 50%/50%, 2) 6.3x multiple (from 6.5x) on lower FY23E EBITDA. We rate BHC Underperform given weak new product cycle, negative operating leverage *and uncertainties around lone value creating catalyst (B+L spin).*

Limited updates on litigation and implications on spin

*On the 1Q call, BHC was largely muted on timeline and potential impact of outstanding litigation matters as they pertained to the proposed B+L spin*. BHC and investors had been expecting an update on a Xifaxan patent dispute matter (known as Rule 60 motion; case with Norwich) but the timeline appears extended with limited clarity around a ruling timeline. In a separate fraudulent conveyance case (brought by Stock Drop opt-outs), BHC remains confident in its position but did not opine on potential implications after a New Jersey Judge recently allowed the case to proceed.

227.   J.P. Morgan analysts quipped that when it comes to Bausch Health earnings calls, "[t]he numbers are important, but the focus immediately shifts to interpreting management's tone, comments and body language."  Although the analysts still "believe[d] management remains committed to the spin[,]" they added that management's "tone is not as convincing[.]"

228.   Bausch Health stock closed on May 4 at $5.89 per share, down 20% from its May 3 closing price of $7.40 per share.  RBC analysts commented on May 5 that "we believe BHC shares strongly underperformed related to BLCO distribution concerns (in a timely manner or at all) given the Q1 EBITDA weakness," among other things.

**June 6, 2023**

229.   On June 6, 2023, Bausch Health announced in a press release two pieces of news: that the FDA had granted tentative approval to Norwich's ANDA, and that Norwich had sued the FDA for final approval.

230.   J.P. Morgan discussed this development in a report ominously titled "When you thought it was nearly over…":

> The FDA's tentative approval of Norwich's gXifaxan for IBS-D may pressure levels as it underscores Norwich's legal options to launch before Jan-28. . . .
>
> *        *        *
>
> **At-risk launch highly probable if finally approved**.   Based on Norwich's court filings, it seems that if the injunction favors Norwich, the company may launch at-risk once the tentative approval is changed to a final approval.  In our view, there may be other options available to Norwich that may facilitate an at-risk launch.[18]

231.   Analysts at RBC "s[aw] this as negative for BHC and a potential BLCO distribution . . . ."   Additionally, "Given that FDA has now granted a [tentative approval] to Norwich's ANDA, we think Norwich could potentially have a stronger case in the appellate court."

232.   Piper Sandler noted an additional reason why the tentative approval was a bad portent for Bausch Health.  With respect to the FDA's "draft guidance regarding potential generics for the 550 mg strength of Xifaxan[,]" "Xifaxan is somewhat

---

[18]   Emphasis in original.

unique in the sense that the hurdles to a potential generic are quite high for an oral solid (in this case, one that has negligible systemic uptake and has an unwieldy release profile locally in the GI tract)[.]"  The FDA's grant of tentative approval to Norwich was taken by Piper Sandler to be "evidence[]" that those hurdles are not "insurmountable" – leading the analysts to "continue to expect that we will eventually see a handful of generics enter the market."

233.    Because of the FDA's grant of tentative approval and Norwich's lawsuit seeking final approval, Bausch Health's stock price dropped more than 10% over three days, closing on June 8, 2023 at $7.10, down from a closing price on June 5, 2023 of $7.94.

## CLASS ACTION ALLEGATIONS

234.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased Bausch Health common stock during the Class Period (the "Class").  Excluded from the Class are the Individual Defendants and their families, Bausch Health, the officers and directors of Bausch Health, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which Defendants and/or Bausch Health have or had a controlling interest.

235.    Common questions of law and fact predominate and include: (a) whether Defendants violated the Exchange Act; (b) whether Defendants omitted and/or

misrepresented material facts; (c) whether Defendants knew or recklessly disregarded that their statements were false; (d) whether the price of Bausch Health common stock was artificially inflated during the Class Period; and (e) the extent of and appropriate measure of damages.

236. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Bausch Health's common stock was actively traded on the NYSE. Upon information and belief, these shares are held by hundreds or thousands of investors.

237. Plaintiffs' claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiffs will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## APPLICATION OF PRESUMPTION OF RELIANCE: THE *Basic* and *AFFILIATED UTE* PRESUMPTIONS

238. Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine as outlined in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") and the presumption of reliance for omissions as outlined in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*").

239. With respect to the *Basic* presumption, a presumption of reliance under the fraud on the market doctrine is appropriate because, among other things:

(a)    Defendants made public misrepresentations and failed to disclose material facts during the Class Period;

(b)    the misrepresentations and omissions were material;

(c)    Bausch Health common stock traded in an efficient market;

(d)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)    Plaintiffs and other members of the Class purchased Bausch Health common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

240.    At all relevant times, the market for Bausch Health common stock was efficient for the following reasons, among others:

(a)    Bausch Health common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)    as a regulated issuer, Bausch Health filed periodic public reports with the SEC and the NYSE;

(c)    Bausch Health regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-

ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Bausch Health was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

241. As a result of the foregoing, the market for Bausch Health common stock promptly digested current information regarding Bausch Health from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of Bausch Health common stock during the Class Period suffered similar injury through their purchase of Bausch Health common stock at artificially inflated prices and a presumption of reliance applies.

242. In addition to the *Basic* presumption, a class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute* because the claims of the Class are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information that was central to Bausch Health's operations and prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important

in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violations of Section 10(b) of
### the Exchange Act and Rule l0b-5
### Promulgated Thereunder Against All Defendants

243.  This Count is asserted against the Defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

244.  During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

245.  Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of the Company as specified herein.

246.   Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period in an effort to maintain artificially high market price for Bausch Health's common shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

247.   Each of the Defendants' liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) the Individual Defendants, by virtue of their responsibilities and activities as senior officers and/or as a director of the Company, were privy to and participated in the creation, development and reporting of the Company's financial results and prospects; (iii) each of the Individual Defendants was advised of and had access to the Company's management team's internal reports and other data and information at all relevant times; and (iv) each of Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

248.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing from the investing public the truth regarding the Company's business prospects and supporting the artificially inflated prices of Bausch Health's common stock.  As demonstrated by Defendants' misstatements of the Company's business and prospects during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

249.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Bausch Health's common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market prices of Bausch Health's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants, or upon the integrity of the markets in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by

Defendants during the Class Period, Plaintiffs and the other members of the Class purchased Bausch Health common stock during the Class Period at artificially high prices and were damaged as a result of the securities law violations alleged herein.

250.   At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the significant problems alleged herein, which were not disclosed by Defendants, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired Bausch Health common stock, or, if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

251.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Bausch Health common stock during the Class Period.

**COUNT II**

**Violations of Section 10(b) of
the Exchange Act and Rule l0b-5(a) and (c)
Promulgated Thereunder Against All Defendants**

252.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

253.    This Count is brought solely and exclusively under the provisions of Rule 10b5(a) and (c).  Accordingly, Plaintiffs need not allege in this Count nor prove in this case that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

254.    During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs and the Class; (ii) artificially inflate the market price of Bausch Health common stock; and (iii) cause Plaintiffs to purchase Bausch Health common stock at artificially inflated prices.

255.    In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and the Class in connection with their purchases of Bausch Health common stock, in violation of Section 10(b) of the

Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.  In particular, Defendants attempted to spin off B+L to defraud potential creditors, but deceivingly structured the transaction to appear legitimate and in the best interests of Bausch Health shareholders, when it was not.

256.    Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included the knowing and/or reckless suppression and concealment of information regarding Bausch Health's business.

257.    Plaintiffs and the Class reasonably relied upon the integrity of the market in which Bausch Health common stock traded.  During the Class Period, Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct and/or the impact of the fraudulent scheme.  Had Plaintiffs and the Class known the true extent of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased Bausch Health common stock, or if they had, would not have done so at the artificially inflated prices paid for such securities.

258.    As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs and the Class suffered damages in connection with their purchases of Bausch Health common stock during the Class Period.

259.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to

Plaintiffs and the Class for damages suffered in connection with their purchases of Bausch Health common stock during the Class Period.

## COUNT III

### Violations of Section 20(a) of
### the Exchange Act Against the Individual Defendants

260.   This Count is asserted against the Individual Defendants for violations of Section 20(a) of the Exchange Act.  Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

261.   By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with, or had, unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

262.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiffs as Class representatives and their counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  March 14, 2025                SEEGER WEISS LLP
                                      CHRISTOPHER A. SEEGER
                                      CHRISTOPHER L. AYERS


                                      _____
                                          *s/ Christopher A. Seeger*
                                      CHRISTOPHER A. SEEGER

55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  973/639-9100
973/679-8656 (fax)
cseeger@seegerweiss.com
cayers@seegerweiss.com

*Liaison Counsel*

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN (*Pro Hac Vice
forthcoming*)
DAVID A. ROSENFELD (*Pro Hac Vice
forthcoming*)
JOSHUA D. FORGY (*Pro Hac Vice
forthcoming*)
ALYSSA H. PLASCOFF (*Pro Hac Vice
forthcoming*)
58 S. Service Road, Suite 200
Melville, NY 11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
jforgy@rgrdlaw.com
aplascoff@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
JONAH H. GOLDSTEIN (*Pro Hac Vice
forthcoming*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dmyers@rgrdlaw.com
jcaringal@rgrdlaw.com
jsanchez@rgrdlaw.com
kdolitsky@rgrdlaw.com

POMERANTZ LLP
MICHAEL J. WERNKE
600 Third Avenue, 20th Floor
New York, NY  10016
Telephone:  212/661-1100
212/661-8665 (fax)
mjwernke@pomlaw.com

*Lead Counsel for Lead Plaintiffs*

BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC
PERETZ BRONSTEIN
60 East 42nd Street, Suite 4600
New York, NY  10165
Telephone:  212/697-6484
212/697-7296 (fax)
peretz@bgandg.com

*Additional Counsel*