<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **R. CASSIAN ANDERSON and DONNA S. PREVES**, *individually and on behalf of all others similarly situated*<br><br>Plaintiffs,<br><br>v.<br><br>**BAUSCH HEALTH COMPANIES INC.,** *et al.*,<br><br>Defendants. | Civil Action No. 23-3996 (ZNQ) (RLS)<br><br>**OPINION** |

<u>**QURAISHI, District Judge**</u>

**THIS MATTER** comes before the Court upon a Motion to Dismiss (ECF No. 59) filed by Defendants Bausch Health Companies Inc. ("Bausch Health" or "the Company"), Joseph Papa, and Paul Herendeen (collectively, "Defendants"). Defendants filed a Brief in Support of the Motion to Dismiss. ("Moving Br.," ECF No. 59-1.) Plaintiffs filed a Brief in Opposition to Defendants' Motion to Dismiss ("Opp.," ECF No. 60), to which Defendants replied ("Reply," ECF No. 61).

The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court will **GRANT** Defendants' Motion to Dismiss.

## I.     BACKGROUND AND PROCEDURAL HISTORY

### A.     Procedural History

Plaintiffs filed an initial complaint on July 26, 2023. (ECF No. 1.)  Thereafter, Plaintiffs filed an amended class-action complaint (ECF No. 24), which the Court dismissed in its entirety on February 12, 2025 (ECF No. 55).  Plaintiffs then filed the Second Amended Complaint ("SAC") on March 14, 2025, which bring claims for violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Securities Exchange Act" or "the Act").[1]  ("SAC," ECF No. 56.) Defendants filed the instant Motion to Dismiss on April 28, 2025.  (ECF No. 59.)

### B.     Factual Background

As alleged in the SAC, Defendant Bausch Health is a global healthcare conglomerate that develops, manufactures, and markets a broad range of pharmaceuticals and medical devices.  (SAC ¶ 17.)  Bausch Health is the successor to Valeant Pharmaceuticals International, Inc. ("Valeant"). (*Id.* ¶ 2.)  Valeant changed its name to Bausch Health in 2018 as a result of securities violations. (*Id.*)  Also named as defendants are Joseph Papa ("Chairman Papa"), Bausch Health's former Chairman and Chief Executive Officer, and Paul Herendeen ("CFO Herendeen"), Bausch Health's former Chief Financial Officer and Executive Vice President.  (*Id.* ¶¶ 18–19.)  This securities action challenges three categories of statements: (1) statements addressing ongoing legacy Valeant litigation; (2) statements concerning a proposed spinoff of Bausch Health's subsidiary Bausch + Lomb; and (3) statements regarding the Company's most valuable drug, Xifaxan.

---

[1] Count One alleges a violation of both Section 10(b) and corresponding Rule 10b-5 of the Securities Exchange Act. Count Two alleges a violation of both Section 10(b) and Rule 10b-5(a) and (c) of the Act.  Count Three alleges a violation of Section 20(a).

1.    <u>Valeant Litigation</u>

In 2019, Bausch Health's predecessor, Valeant, settled a securities fraud class action against it for $1.2 billion.  (*Id.* ¶ 2.)  However, some institutional investors opted out of that class, choosing instead to pursue their own direct actions.  (*Id.*)  According to Plaintiffs, the opt-outs alleged damages totaling $4.2 billion, which "far outweighs the entire market value of Bausch Health."  (*Id.* ¶ 88.)  Despite this massive amount of potential liability, Plaintiffs claim that Defendants kept this level of exposure from investors by assuring them that there were only "some" or "a couple" of opt-outs and that the Valeant litigation was essentially "in the rearview."  (*Id.* ¶¶ 95, 97.)  Indeed, analyst reports at the time of the settlement and in the years following did not, for the most part, discuss the opt-outs, but rather reported that the litigation from the Valeant litigation was now behind the Company.  (*Id.* ¶ 95.)  This understanding, according to Plaintiffs, made sense given Defendants' statements attempting to mislead the market about the Company's remaining exposure.  (*Id.* ¶ 97.)  However, Plaintiffs allege that Defendants knew of the sizeable number of opt-outs and the Company's litigation exposure despite their statements to the contrary. (*Id.* ¶¶ 90–92.)

2.    <u>The B+L Spinoff</u>

Prior to May 5, 2021, Bausch Health's portfolio of products fell into four operating and reportable segments: (1) Bausch + Lomb/International ("B+L"); (2) Salix; (3) Ortho Dermatologics; and (4) Diversified Products.  (*Id.* 28.)  The Company's 2022 Form 10-K reported revenues for 2020, 2021, and 2022 of $8,027 million, $8,434 million, and $8,124 million, respectively.  (*Id.* ¶ 30.)  As of 2019, the Company's capital structure (*i.e.*, the mix of debt and equity financing its assets) was overwhelmingly debt-heavy, with $33.8 billion of assets, compared to $32.7 billion of liabilities and equity of $1.1 billion.  (*Id.* ¶ 31.)  Bausch Health also had a net

leverage[2] of about 7.5, which according to Plaintiffs "is unusually high" and indicates a serious risk of default. (*Id.* ¶¶ 33–34.) Much of this debt originated from Valeant, which borrowed large sums of money to finance a series of acquisitions. (*Id.* ¶ 32.)

According to Plaintiffs, Bausch Health was focused on reducing these liabilities. Chairman Papa explained on May 12, 2020 that the Company had: "paid down over $8 billion of debt since . . . 2016. [The Company] recognize[s] though, that [it] still [has] significant amount of debt. . . . So, for example, [the Company] divested about $3.8 billion of assets, the proceeds that [it] received to pay down debt as one example." (*Id.* ¶ 38.) The Company conducted no major divestitures in 2018, 2019, or 2020, other than what the SAC calls the "B+L spinoff" in August 2020. (*Id.* ¶ 41.)

On August 6, 2020, Bausch Health announced that it intended to establish a B+L spinoff, which would result in the establishment of two separate companies: an eye-health company based on Bausch + Lomb, and a diversified pharmaceutical company. (*Id.* ¶ 43.) When asked why the spinoff was announced now given that the "potential of separation is something [the Company] discussed in the past," Chairman Papa explained that Bausch Health's "legal issues" were now behind them and that the Company was now in a position where it could divest assets and pay down its debt. (*Id.* 45.) Chairman Papa further explained that by separating the companies, Bausch Health could put itself in the best position to grow those companies over the long term. (*Id.*) The market reacted positively to the announcement, with the Company's stock price surging 30% in pre-market trading on August 6, 2020. (*Id.* ¶ 48.)

On September 16, 2020, CFO Herendeen explained how the Company could spin off the Eye Health business in light of the Company's leverage. (*Id.* ¶ 52.) The plan he presented was to precede the spinoff with an IPO by selling approximately 20% of B+L, while acknowledging that

---

[2] Net leverage is a company's ratio of non-current long-term debt to EBITDA. EBITDA is a company's net earnings before considering interest, tax, depreciation, and amortization expenses.

there were a number of alternatives for any separation. (*Id.*) Importantly, CFO Herendeen explained that Bausch Health would need 5.5 net leverage for this scenario to work. (*Id.* ¶¶ 53, 54.) In February and March 2021, a hedge fund that owned a small portion of Bausch Health, and J.P. Morgan, wrote to Bausch Health management criticizing Defendants' plans and arguing that the Company would need to sell twice the amount of equity for the plan to work. (*Id.* ¶¶ 55–57.) On May 4, 2021, the Company announced that it had completed internal accounting rearrangements necessary to move forward with the spinoff. (*Id.* ¶ 59.) That same day, Defendants announced that, post-spin, Bausch Health would be almost three times as leveraged as B+L. (*Id.* ¶ 60.) Because investors apparently believed that the net leverage for B+L and Bausch Health would be 4x and 5.5x, respectively, Bausch Health stock dropped 11% in a single day. (*Id.* ¶¶ 60, 63.)

On August 3, 2021, Defendants announced plans for an IPO of Solta, Bausch Health's medical aesthetics subsidiary. (*Id.* ¶ 68.) This IPO was to take effect before the B+L IPO, which would help "pay down Bausch Health debt with money raised from the IPO." (*Id.*) However, this IPO was later suspended due to challenging market conditions. (*Id.* ¶ 83.)

On January 13, 2022, Defendants filed an S-1 for the B+L IPO. (*Id.* ¶ 69.) On January 18, 2022, Defendants announced a credit agreement where some of its debts would be refinanced. (*Id.* ¶ 70.) On April 28, 2022, Bausch Health announced a price target of $21-24 per share for the upcoming B+L IPO, "which was significantly lower than Defendants had led the market to expect." (*Id.* ¶ 71.) One reason analysts suggested for the lower-than-expected price per share was Norwich's intellectually property challenge to Xifaxan. (*Id.* ¶ 72.) On this news, Bausch Health's stock dropped an additional 7%, from $20.56 per share to $19.01 per share. (*Id.* ¶ 73.)

On May 5, 2022, the Company announced a finalized price of $18 per share for the B+L IPO, which was "far less than had been expected." (*Id.* ¶ 75.) In response to reports by analysts and the reduced-price target, Bausch Health stock dropped again, closing at $12.90 on May 9, 2022. (*Id.* ¶ 82.) Ultimately, the Company only sold 10% of B+L during the IPO. (*Id.* ¶ 107.) According to Plaintiffs, Defendants' affirmative statements about the B+L spinoff to pay down debt and bring Bauch Health's leverage ratios to healthy levels created a duty for them to disclose the true purpose of the spinoff, which was "to deny the Opt-Out Plaintiffs of a funding source from which to collect a potential judgment or settlement." (*Id.* ¶ 86.) However, the B+L spinoff never actually took place.

### 3.    Xifaxan Litigation

In addition to these alleged misrepresentations, the SAC alleges that there were misrepresentations as to the strength of Defendants' Xifaxan patents, which are crucial to Bausch Health's success. Salix, one of Bausch Health's subsidiaries, is a pharmaceutical company focused on the treatment of gastrointestinal disorders and diseases. (*Id.* ¶ 114.) During the Class Period, Xifaxan was Salix's largest product, accounting for roughly 80% of its revenue between 2020 to 2022. (*Id.*) Many analysts and Plaintiffs assumed that Xifaxan patents were safe until 2028 because Defendants did not disclose the seriousness of any challenges to Xifaxan in the market. (*Id.* ¶ 65.)

In February 2020, Defendants were advised that Norwich submitted a drug application to the Food and Drug Administration ("FDA") for approval of a generic version of Xifaxan. (*Id.* ¶ 120.) Norwich also sent a letter to Salix asserting that many of the patents covering Xifaxan were invalid and unenforceable. (*Id.*) In response to the letter, Bausch Health filed a complaint in the United States District Court for the District of Delaware against Norwich for patent infringement. (*Id.* ¶ 121) (citing *Salix Pharms., Ltd. v. Norwich Pharms., Inc.*, Civ. No. 20-430 (D. Del.)).

Plaintiffs allege that Defendants "were aware of Norwich's position by no later than February 2020" and that "investors were essentially left in the dark." (*Id.* ¶ 127.) The SAC cites to various misleading representations made by the Company after February 2020 concerning the strength of its patents for Xifaxan. (*See, e.g., id.* ¶ 127.) While Plaintiffs acknowledge that the Company disclosed the litigation in a Form 10-K filed with the SEC on February 19, 2020, they allege that Defendants' statements about Xifaxan's longevity created a duty to make adequate disclosure of the credibility of Norwich's claims and the risk that the Xifaxan patents could be found invalid. (*Id.* ¶ 129.)

## II.    SUBJECT MATTER JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa.

## III.    LEGAL STANDARD

### A.    Rule 12(b)(6)

Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (abrogated on other grounds)).

A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Rule 12(b)(6). *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of the plaintiff's well-pled factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation

omitted).  The court, however, may ignore legal conclusions or factually unsupported accusations that merely state the defendant unlawfully harmed the plaintiff.  *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"  *Fowler*, 578 F.3d at 211 (*quoting Iqbal*, 556 U.S. at 679).  A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 210 (*quoting Iqbal*, 556 U.S. at 663).  On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented."  *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (*citing Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

There is also a three-step process with respect to motions to dismiss in a Section 10(b) action under the Securities Exchange Act, as is the case here.  First, as with any Rule 12(b)(6) motion, courts must "accept all factual allegations in the complaint as true."  *Winer Family Tr. v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007).  Second, "courts must consider the complaint in its entirety."  *Id.* (*quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).  And third, in determining whether the pled facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences.  *Id.*

### B.    The PSLRA and Rule 9

Fraud-based claims brought under the Securities Exchange Act and alleged as part of a private securities class action are additionally subject to the heightened pleading requirements of both Rule 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u, *et seq.*, (the "PSLRA").  *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276–77 (3d Cir. 2006).

Under Rule 9(b), a plaintiff must "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b); *see also Frederico v. Home Depot*, 507 F.3d 188, 200–02

(3d Cir. 2007) (noting that a court may grant a motion to dismiss a fraud-based claim if the plaintiff fails to plead with the required particularity). Particularity requires sufficient details to put the defendant "on notice of the precise misconduct with which [it is] charged." *Id.* at 201 (alteration in original) (*quoting Lum v. Bank of Am.*, 361 F.3d 217, 223–24 (3d Cir. 2004) (abrogated on other grounds)) (internal quotation marks omitted). At a minimum, Rule 9(b) requires a plaintiff to allege the "essential factual background that would accompany the first paragraph of any newspaper story—that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema Specialties*, 438 F.3d at 276–77.

The PSLRA, which has an even higher pleading standard than Rule 9(b), is targeted at preventing abusive securities litigation. *See Tellabs, Inc.*, 551 U.S. at 313 ("Private securities fraud actions . . . if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law."). The PSLRA provides two distinct pleading requirements, both of which must be met for a securities complaint to survive a motion to dismiss. *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009). First, under 15 U.S.C. § 78u–4(b)(1), the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Id.* (*quoting Winer Family Tr.*, 503 F.3d at 326) (internal quotation marks omitted). Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (*quoting* 15 U.S.C. § 78u–4(b)(2)) (internal quotation marks omitted).

Both provisions of the PSLRA require facts to be pled with "particularity." *Id.* at 253. As such, this particularity language echoes the requirements of Rule 9(b). *Id.* Indeed, although the

PSLRA replaces Rule 9(b) as the pleading standard governing private securities class actions, Rule 9(b)'s particularity requirement "is comparable to and effectively subsumed by" PSLRA § 78u–4(b)(1). *Id.* (discussing the PSLRA's requirement that a plaintiff plead the "who, what, when, where and how: the first paragraph of any newspaper story") (internal quotation marks omitted).

## IV.    DISCUSSION

Defendants argue in their Motion that the SAC should be dismissed because: (1) none of the statements identified by Plaintiffs are false; (2) even if the statements were false, there are no allegations that raise an inference of scienter; (3) Plaintiffs fail to plead loss causation; (4) Plaintiffs fail to plead scheme liability; (5) Plaintiffs fail to specific each Defendant's role in making the challenged statements; and (6) Plaintiffs' claim under Section 20(a) fails because there is no primary violation under Section 10(b).

### A.    Violations of Section 10(b) And Rule 10b-5 (Count I)

Section 10(b) of the Act prohibits the "use or employ[ment], in connection with the purchase or sale of any security . . . [, of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014) (quoting 15 U.S.C. § 78j(b)). "SEC Rule 10b–5 implements this provision by making it unlawful to, among other things, 'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Id.* Therefore, to state a claim under Section 10(b) and Rule 10b-5, Plaintiffs must allege, among other things, (1) misstatements or omissions of material facts, i.e., falsity, (2) scienter, and (3) loss causation. *See id.*

1.    <u>Safe-Harbor</u>

Under the PSLRA, there is a "safe-harbor" that immunizes "forward-looking" statements that are accompanied by "meaningful cautionary statements" or where the plaintiff "fails to show the statement was made with actual knowledge of its falsehood." *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 491 (3d Cir. 2016). Forward-looking statements are defined broadly and include statements "'containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items'; statements of 'the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer'; or statements of 'future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission.'" *Avays, Inc.*, 564 F.3d at 255. A statement relating to or underlying the assumptions is also considered a forward-looking statement. *See id.* However, "a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Id.* (citation modified).

Forward-looking statements may still be actionable if they are not accompanied by meaningful cautionary statements or if the plaintiff demonstrates that they were made with actual knowledge of its falsehood. *See OFI Asset Mgmt.*, 834 F.3d at 491. A "meaningful cautionary statement" cannot be a vague or boilerplate disclaimer but rather must be "substantive and tailored" to the specific statements challenged by the plaintiffs. *OFI Asset Mgmt.*, 834 F.3d at 491. Moreover, it must "identify[] important factors that could cause actual results to differ materially from those in the forward-looking statement." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 282 (3d Cir. 2010). Moreover, "[t]he safe harbor applies to forward-looking statements that are not

material." *Id.* at 283.  Statements "such as opinions, motives and intentions, or general statements of optimism . . . constitute no more than 'puffery'" and are immaterial.  *Id.*

Defendants argue that many of their statements are inactionable forward-looking statements that the Court has already dismissed in its prior Opinion.  (Moving Br. at 10.)  As an initial matter, it appears that most of the statements that the Court previously held to be inactionable forward-looking statements have been removed by Plaintiffs.  (Opp. at 10; *see* SAC.)  Of the remaining statements, the Court will address those individually.

First, Plaintiffs allege that Chairman Papa made material misrepresentations concerning the opt-out plaintiffs.  (SAC ¶ 153.)  In response to a question from Barclays about the $1.2 billion class-action settlement, Chairman Papa explained the settlement was "behind" the Company but that there was still "a couple of opt outs" that needed to be addressed.  (*Id.*)  Plaintiffs argue that this was a "present-tense statement" and was materially false and misleading because there were "at least thirty-three opt-out litigations" claiming billions in damages.  (Opp. at 60.)  The Court agrees that this is not forward-looking because it discusses the past (i.e., what was "behind" the company) and what litigation the Company was currently facing.  While the litigation would be addressed in the future, the statement about a "couple of opt outs" concerns the Company's current litigation exposure and is thus a non-forward-looking statement.  *See EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 876 (3d Cir. 2000) (holding that statements concerning the "current state of negotiations" could be construed as a statement of fact rather a prediction of future events).  Accordingly, paragraph 153 of the SAC is not protected by the PSLRA safe harbor and will be discussed below.

Second, the Court previously held certain statements concerning the strength of the Company's patents to be forward-looking.  ("Opinion", ECF No. 54 at 26.)  It appears that only

four of those statements remain at paragraphs 160, 162, 164, and 166.  As Defendants point out, the Court previously found these statements to be inactionable because they "(1) provide what the company thinks will happen in the future, (2) are statements of corporate optimism, and (3) express how the executives feel about certain business decisions and their legal positions regarding the patent litigation."  (Opinion at 26; *see also* Moving Br. at 13.)  Plaintiffs argue that these statements are misleading because they fail to "acknowledg[] the credible threat from Norwich."  (Opp. at 8.) As the Court found in its prior opinion, these statements are largely forward-looking and statements of corporate optimism that are inactionable.  (Opinion at 26.)  For example, in paragraph 162, Chairman Papa, in the context of discussing the exclusivity of the Company's patents, states "we do think we've got that — the longevity of that Xifaxan that will allow us to manage our way through this . . . ."  (SAC ¶ 162.)  His statement about what he "thinks" is a general and vague statement of corporate optimism concerning his hope that the exclusivity based on the Company's patents will continue.  *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir. 1997).  However, paragraph 160 does contain a statement of present fact.  There, Chairman Papa stated: "As we worked through the majority of that now, we're seeing a lot less of that in the next 2, 3, 4 years.  Therefore, we won't have that headwind against us that we had the last 2 or 3 years." (SAC ¶ 160.)  In this statement, Chairman Papa not only discusses what he believes will happen in the future (and is therefore inactionable) but also states that the Company "worked through the majority" of the challenges to the Xifaxan patents.  As alleged by Plaintiffs, this statement is untrue because Defendants failed to acknowledge the credible threat from Norwich.  Even assuming this is an untrue statement, it is not actionable because the challenges to the Company's patents were publicly known, and Defendants therefore had no duty to disclose them.  *See In re Ocugen, Inc.*

*Sec. Litig.*, 2024 WL 1209513, at \*3 (3d Cir. Mar. 21, 2024).  Accordingly, the Court finds that paragraphs 160, 162, 164, and 166 are inactionable under Section 10(b).

2.    <u>Material Misrepresentations</u>

To plead liability in a Section 10(b) action, a plaintiff must allege, among other elements, that a defendant made a material misrepresentation or omission.  *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006).  In other words, Section 10(b) prohibits two things: (1) making an "untrue statement of a material fact, —*i.e.*, false statements or lies" or (2) "omitting a material fact necessary to make the statements made . . . not misleading." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024) (citation modified).  "Pure omissions," as opposed to "half-truths," are not actionable.  *See id.* at 264.  Rather, there must be some affirmative statement that, when made, requires the disclosure of additional information to make the statement clear and complete.  *See id.*  It is not enough for a plaintiff to identify the omission or misstatement; he or she must allege that the misstatement or omission is material, i.e., "something that would alter the total mix of relevant information for a reasonable investor making an investment decision." *Burlington*, 114 F.3d at 1426.  Here, Plaintiffs allege three categories of statements are materially false and misleading.

### a) *Opt-Out Litigation*

Plaintiffs allege that Defendants made various false and misleading statements by downplaying the remaining opt-out litigation.  (SAC ¶¶ 146, 149, 151, 153).  The SAC includes one new statement not previously alleged at paragraph 146.  There, Chairman Papa stated that the Company has "taken care of the majority" of the lawsuits.  (SAC ¶ 146.)  Plaintiffs argue that these statements are materially misleading because they fail to disclose the "massive liability from the Opt-Out Plaintiffs."  (SAC ¶ 147.)  Defendants, on the other hand, argue these statements are not false because Defendants acknowledged that there were still opt-outs and clarified that most of the

potential exposure, i.e., the class action lawsuit, was behind them. (Moving Br. at 10.) The Court agrees with Defendants. Nothing in these statements is false or misleading. When read in context, Chairman Papa is discussing the majority of the lawsuits (i.e., the class-action) filed against Defendants. That class-action lawsuit was undoubtedly "behind" the Company, and it is certainly true that the Company "had taken care of the majority" of the litigation. The fact that certain opt-out plaintiffs remained does not negate the fact that the bulk of the litigation and liability had been resolved. Defendants' statements, when read in context, are thus true.[3]

Nor are these statements misleading because Defendants failed to disclose that the opt-out plaintiffs alleged billions of dollars in damages. As the Third Circuit held in *OFI Asset Mgmt.*, defendants are under no obligation to use pejorative adjectives to describe transactions that may be facing headwinds. 834 F.3d at 504. The same is true here, where the opt-out plaintiffs allege billions in damages in a one-sided report that is inevitably going to take a maximalist position. Defendants were not obligated to disclose the existence of the alleged liability, particularly given that there are no allegations in the SAC to support the report's veracity or whether the data underlying it was valid. *See Ind. State Dist. Council of Laborers and HOD Carriers Pension and Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 947 (6th Cir. 2009) (finding no duty to disclose third-party legal findings or consequences where the materiality of such omissions would have been derived "solely" from the actions of a third-party). Consequently, Plaintiffs allegations in paragraphs 146, 149, 151, and 153 are not materially false or misleading.

---

[3] The fact that Defendants referred to the number of opt-outs as a "couple" does not change this analysis. As alleged, the material information that a reasonable investor would like to know is the "massive liability" alleged by the opt-out plaintiffs. But as explained below, Defendants were not required to disclose a one-sided assessment of potential damages. Moreover, the 37 opt-outs were adequately disclosed in the Company's SEC filings. (*See* Bausch Health 10-K, ECF No. 59-4 at 365.)

### b)  B+L Spinoff

Plaintiffs allege that a single press release from August 6, 2020 was materially false and misleading because it failed to disclose that the real purpose for the B+L spinoff was to prevent the opt-out plaintiffs from collecting a future judgment or settlement.  (SAC ¶ 156.)  Defendants argue that this press release cannot support a section 10(b) action because it is a forward-looking statement and is based entirely on speculation.  (Moving Br. at 11–12.)  In response, Plaintiffs assert that the SAC changed these statements to ones of present fact and are actionable because the SAC adequately alleges that the true purpose of the spinoff was to limit recovery.  (Opp. at 37.)  In support of this assertion, Plaintiffs allege that the true purpose of the spinoff can be inferred from: (1) the unequal debt load between the two companies; (2) Defendants' sudden announcement of the spinoff; (3) the disproportionate leveraging was contrary to what Defendants led the market to expect; (4) the IPO was executed despite poor market conditions; (5) key management joined the spinoff company; and (6) several "badges of fraud" under fraudulent conveyance law exist. (Opp. at 27–29.)  Here, the press release states, in relevant part: "We are committed to taking action to unlock what we see as unrecognized value in Bausch Health shares, and we believe that separating our business into two highly focused, stand-alone companies is the way to accomplish that goal."  (SAC ¶ 155.)

The Court finds no reason to depart from its prior holding that this is an inactionable forward-looking statement because it refers to what the Company believes and involves projections of revenue, income, earnings, and capital expenditures.  (Opinion at 19.)  Under the securities laws, "[s]tatements are non-actionable if they are 'puffery' that is 'too general to cause a reasonable investor to rely upon them,' or 'general expressions of corporate optimism' that are 'too indefinite to be actionable under the securities laws.'"  *Haw. Structural Ironworkers Pension*

*Trust Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 845 (S.D.N.Y. 2019) (citation modified).  Here, the Company is undisputedly discussing what it believes the effect of the spinoff will be and is thus an inactionable forward-looking statement that is nothing more than corporate optimism.  *See Avaya*, 564 F.3d at 255.  Moreover, Plaintiffs' allegations that the true purpose of the spinoff was to conceal assets is entirely speculative and cannot support a claim for fraud under the PSLRA or Rule 9.  (Opinion at 19.)

#### c)  *Xifaxan Statements*

There is only one remaining statement concerning the *Xifaxan* litigation that Plaintiffs allege to be materially false and misleading.  (SAC ¶ 158.)  On May 7, 2020, Chairman Papa stated on the Company's earnings call that "all intellectual property protecting Xifaxan remains intact, and we preserve market exclusivity until 2028." (*Id.*)  Plaintiffs allege this statement is misleading because Defendants failed to disclose "the very real risk" of Norwich's claims concerning Xifaxan's intellectual property.  (*Id.*)  However, as the Court previously found, this statement "is objectively true and not misleading," and "the challenges to the Salix patents were publicly known and Defendants therefore have no duty to disclose those challenges."  (Opinion at 26–27.)

Accordingly, the Court finds that none of the statements in the SAC are materially false and misleading.

### B.    Violations of Rule 10b-5(a) and (c) (Count II)

Plaintiffs allege a new claim against Defendants for a scheme to defraud in violation of Section 10(b) of the Exchange Act and SEC Rules 10b-5(a) and (c).  (SAC ¶¶ 252–59.)  Claims under Rules 10b-5(a) and (c) are referred to as "scheme liability claims" because they provide a private right of action for deceptive conduct, as opposed to Rule 10b-5(b) which relates to deceptive statements.  *See In re RenovaCare, Inc. Sec. Litig.*, Civ No. 21-13766, 2024 WL

2815034, at *22 (D.N.J. June 3, 2024).  To state a claim of scheme liability, plaintiffs "must allege (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance."  *SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 351 (D.N.J. 2009).  The Supreme Court has held that "[t]hese provisions capture a wide range of conduct" and that there is "considerable overlap among the subsections of the Rule," including the section prohibiting misstatements.  *Lorenzo v. SEC*, 587 U.S. 71, 79–80 (2019). However, "misstatements and omissions alone are not enough for scheme liability," *SEC v. Rio Tinto plc*, 41 F.4th 47, 54 (2d Cir. 2022), there must be "something extra" for plaintiffs to bring a claim under Rules 10b-5(a) and (c).  *In re Turquoise Hill Resources Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 251 (S.D.N.Y. 2022).  "Though liability under Rules 10b-5(a) and (c) may attach despite dismissing a 10b-5(b) claim, as a baseline the conduct supporting 10b-5(a) or (c) claims must involve statements that qualify as false or misleading or must involve entirely separate conduct apart from the statements supporting a 10b-5(b) claim."  *In re Ocugen, Inc. Sec. Litig.*, 659 F. Supp. 3d 572, 597 (E.D. Pa. 2023).

Here, Plaintiffs allege that Defendants structured the B+L spinoff in a way that appeared legitimate and in the best interest of Bausch Health shareholders, when in reality the spinoff was designed to defraud creditors.  (*Id.* ¶ 255.)  Defendants, however, argue that Plaintiffs allege nothing inherently deceptive about Defendants' conduct other than the alleged misstatements. (Moving Br. at 23.)  In response, Plaintiffs argue that "nothing about the spinoff made sense" and point to various actions taken by Defendants that show the spinoff "was a sham."  (Opp. at 31–32.)  First, Plaintiffs argue that Defendants transferred assets to B+L before the spinoff to disproportionately leverage Bausch Health.  (Opp. at 31; SAC ¶ 61.)  Second, Plaintiffs argue the B+L IPO was executed during poor market conditions, which Defendants knew about because

they suspended the Solta IPO.  (Opp. at 32; SAC ¶ 106.)  Third, Plaintiffs argue Defendants misled the market into believing that the Company would sell 20% of B+L but instead only sold 10%. (Opp. at 32; SAC ¶ 106.)  All these actions, according to Plaintiffs, were "done solely 'to obscure the true purpose of the spinoff."  (Opp. at 32.)

Although Plaintiffs have alleged actions taken by Defendants beyond misstatements, the crux of the fraudulent scheme alleged by Plaintiffs is the Defendants' alleged concealment of the true purpose of the B+L spinoff.  And because the Court held that Defendants' statements were not "false or misleading," Plaintiffs needed to show a fraudulent scheme that was independent of those allegations.  *See In re Ocugen, Inc. Sec. Litig.*, 659 F. Supp. at 597.  This case is thus distinguishable from the cases cited by Plaintiffs, in which the fraudulent scheme involved the dissemination of false statements or was entirely independent of the alleged misstatements (e.g., a fraudulent "pump and dump" scheme or "fraudulent billing" scheme).  (Opp. at 32.)  While Plaintiffs alternatively argue that the fraudulent scheme was to transfer assets away from Bausch Health to prevent opt-out plaintiffs from collecting on a potential judgment, that argument holds no weight because the spinoff did not occur, and any judgment is merely speculative.  In other words, the allegedly fraudulent conduct has not even taken place, and even if the spinoff had occurred, it is entirely speculative whether the opt-out plaintiffs would be unable to collect on a judgment rendered in their favor.[4]  Accordingly, Plaintiffs scheme liability claims must be dismissed.  *See In re Ocugen, Inc. Sec. Litig.*, 659 F. Supp. at 598.

---

[4] Plaintiffs cite to *In re Smith Barney Transfer Agent* for the proposition that scheme liability can be pled when a company's actions are designed to conceal assets.  (Opp. at 33.)  However, in *In re Smith*, the court found scheme liability had been adequately pled where the defendants actually funneled funds away from their rightful owners.  884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012).  In contrast, here there are no allegations in the SAC that the allegedly fraudulent scheme (i.e., the spinoff) had been executed or that that opt-out plaintiffs have been unable to collect on any judgments entered in their favor.

## C.    Violation Of Securities Exchange Act Section 20(a) (Count Three)

A plaintiff bringing a claim under Section 20(a) of the Securities Exchange Act must plead: "(1) an underlying primary violation by a controlled person or entity; (2) that [the defendants] exercised control over the primary violator; and (3) that the [d]efendants, as controlling persons, were in some meaningful sense culpable participants in the fraud." *Wilson v. Bernstock*, 195 F. Supp. 2d 619, 642 (D.N.J. 2002). In other words, "[l]iability under Section 20(a) is predicated upon an independent violation of [the Securities Exchange Act] or the rules or regulations thereunder." *Id.* (quoting *In re Party City Secs. Litig.*, 147 F. Supp. 2d 282, 317 (D.N.J. 2001) (internal quotation marks omitted)). Under Section 20(a), a plaintiff may bring a cause of action against individuals who control a corporation that has violated Section 10(b), 15 U.S.C. § 78t(a), but "liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person." *Avaya*, 564 F.3d at 252. Because the Court has found that there are no underlying primary violations under Section 10(b), the Court will also dismiss Count III.

## V.    <u>**CONCLUSION**</u>

For the reasons stated above, the Court will **GRANT** Defendants' Motion to Dismiss. (ECF No. 59.)  Plaintiffs have now had two opportunities to amend their complaint, and in each of their three pleadings they have been unable to state a claim for which relief can be granted.  The Court cannot see a circumstance where providing Plaintiffs with yet another opportunity to cure the defective pleading would result in anything more than an exercise in futility.  Accordingly, the Court finds that further amendment would be futile, and the SAC will be **DISMISSED WITH PREJUDICE**.  *See Riboldi v. Warren Cnty. Dep't of Hum. Servs. Div. of Temp. Assistance & Soc. Servs.*, 781 Fed. App'x 44, 47 (3d Cir. 2019) (affirming dismissal with prejudice on the basis that the allegations were deficient and plaintiff was already afforded two opportunities to amend his claims); *Van Brunt v. Wells Fargo Bank, N.A.*, Civ. No. 19-170, 2023 WL 4447016, at *10 (D.N.J. July 11, 2023).


Date: November 20, 2025


s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**
